CITY OF COLUMBUS, EX REL. WILLITS ET AL., APPELLEES,
*v.* CREMEAN, DIR., DEPARTMENT OF PUBLIC
SERVICE, ET AL., APPELLANTS.

[Cite as Columbus, ex rel. Willits, v. Cremean (1971),
27 Ohio App. 2d 137.]

(No. 71-64—Decided May 25, 1971.)

*Messrs. Dunbar, Kienzle & Murphey* and *Mr. David J. Young,* for appellees.

*Mr. John C. Young,* city attorney, *Mr. William J. Melvin* and *Mr. Thomas A. Bustin,* for appellants.

Troop, P. J. Defendants, Warren J. Cremean, director of the department of public service, L. E. Meenan, treasurer, and Paul Schooley, assistant safety director of the city of Columbus, appeal from a judgment of the Common Pleas Court of Franklin County, filed February 23, 1971, on questions of law. The order from which the appeal is taken reads as follows:

"It is therefore ordered and adjudged that defendants be and they are hereby permanently enjoined from collecting or charging any of the sewerage charges sought to be imposed by Ordinance No. 1687-70. * * *"

A supplemental complaint, or petition, was filed in this case, which is the subject of certain of appellants' assignments of error. The portion of the order of the trial court giving rise to objections reads as follows:

"* * * The Court finds that as a matter of law any citizen of the City of Columbus has the legal right to a building and sewer permit if he has complied with all legislative and regulatory requirements. Accordingly, defendants Schooley and Cremean should be and are enjoined from their respective freezes and may not, at their discretion, refuse to issue building and sewer permits on a first-come first-serve basis. * * *"

Appellants predicate their appeal upon six assignments of error. This review will be divided into sections respecting the six errors assigned.

## I

"The judgment of the trial court on the original complaint is contrary to law in regard to the standing of plaintiff-appellee, David Willits, to bring this action as a taxpayer's action."

So-called "taxpayer actions" have provoked much litigation in Ohio courts which, though somewhat exhaustive, has not resolved every question which might arise under the various legislative authorizations.

R. C. 733.56, 733.57, and 733.58 authorize a solicitor to proceed and file certain actions to accomplish benefits for a municipality, such as the performance of a contract or to prevent abuses or a violation of applicable law. The taxpayer may enter upon the scene, if the solicitor fails in his prescribed duties, by virtue of the provisions in R. C. 733.59. Similar in content, and more directly involved in this case, are sections 71 and 74 in the charter of the city of Columbus. Petitioner in the original action, David Willits, by affidavit, avers that he complied with those applicable charter provisions before instituting his action on behalf of the city of Columbus.

It appears that David Willits is a resident of the city of Bexley, and not a freeholder or tenant in the city of Columbus, although an employee of the Columbus board of education and therefore obliged to pay a Columbus city income tax. Appellants take the position that Mr. Willits is not, being a nonresident, qualified to bring this taxpayer's action.

Appellants offer a variety of decisions in support of the contention that Willits is without standing to sue. One very old one, *Vadakin, on Behalf of the City of Newark, Ohio,* v. *Crilly* (1905), 7 C. C. (N. S.) 341, held that the plaintiff was without standing not because he was a nonresident but because the court found that he had acted in bad faith. At page 342, the court said:

"* * * he is not bringing this suit as a tax-payer, in the interest of the city and the tax-payers of the city, but is bringing it solely for the purpose of furthering private ends, and the ambitions and schemes of other men who are not in court themselves * * *."

Such a pronouncement prompts the surmise that careful investigation might find many taxpayer suits to have been brought by one who could be found to be acting in comparable bad faith.

The plaintiff in *Fischer, a Taxpayer,* v. *Cleveland* (1931), 42 Ohio App. 75, was found to lack standing because he could show no evidence of pecuniary injury when he tried to get a restraining order against boxing exhibitions scheduled for the public gymnasium. And similarly,

in *Harnett* v. *Edmonston, Dir. of Dept. of Industrial Relations* (1932), 44 Ohio App. 304, this Court of Appeals, then the second district, held that Harnett, oddly enough a citizen and taxpayer of Bexley, could show no material injury to himself by the installation of a heating system in a public school. There was found to be no damage to the plaintiff who filed an action for an accounting and the recovery of money as reviewed in *Agins* v. *University Heights* (1952), 68 Ohio Law Abs. 65.

A departure appears in *Brauer* v. *Cleveland* (1963), 119 Ohio App. 159, a decision in which the Court of Appeals held that a plaintiff was not obliged to show irreparable damage to establish standing, but need only show an abuse of discretion injurious to his rights as a taxpayer. Appellants also cite *Porter* v. *Oberlin* (1965), 1 Ohio St. 2d 143, and rely upon the position taken by Judge Schneider in his concurring opinion, relative to the standing of the plaintiff, where he said, at page 160:

"* * * claims no special interest or damage to himself or to his property or claims no misapplication of public funds. * * *"

The majority said that the plaintiff could bring his action for a declaratory judgment, designed to test the constitutionality of Oberlin's fair housing ordinance, under R. C. 733.56 and 733.59, because the evidence, and the face of the ordinance itself, showed an expenditure of money to be necessary.

It should be noted that none of these decisions are squarely decisive of the question raised by this assignment of error. Most of them involve equitable actions in injunction, or other special actions, and invoke traditional equitable propositions of law. They do not directly settle the question of standing as raised in the instant case.

City income tax devices, as might be expected, produced litigation. A rather early decision in *Angell* v. *Toledo* (1950), 153 Ohio St. 179, upheld municipal income taxes, including the tax imposed on the income of a nonresident, collected at the source, on the ground that the city affords the taxpayer a place to work. protection, etc.; he has, then, a beneficial interest at stake, said the court.

A city of Columbus case followed later. *State, ex rel. Miller,* v. *Price, City Auditor* (1965), 3 Ohio St. 2d 177, concerns a payer of city income taxes who sought to make members of the Ohio General Assembly pay income taxes also. Interestingly, the Supreme Court said in *Price* that there is no residence requirement contained in R. C. 733.59 which permits a demand to be made on a city solicitor of a municipal corporation to institute suit. The court said the following:

"* * * If realtor has a sufficient beneficial interest in the Columbus city government to justify imposition of its income tax on him, * * *, it necessarily follows that he has an interest in having the tax collected from others who should pay it, and is therefore beneficially interested in the relief sought by this action."

The most recent decision by the Supreme Court, in *State, ex rel. Nimon,* v. *Springdale* (1966), 6 Ohio St. 2d 1, seems to have anticipated the question here for review under this assignment of error. A paragraph of the syllabus provides a significant general proposition, as follows:

"2. The word, 'taxpayer,' as used in Section 733.59, Revised Code, contemplates and includes any person who, in a private capacity as a citizen, elector, freeholder or taxpayer, volunteers to enforce a right of action on behalf of and for the benefit of the public, and any such person is subject to the conditions imposed by that section, unless waived."

Such pronouncement takes on more significance for present purposes when read in view of the more comprehensive language at page 6, as follows:

"* * * An 'elector' necessarily is a domiciliary and it would be an extreme situation wherein such person might not in fact pay any tax, directly or indirectly, to the political subdivision of his domicile.

"But the sounder view is that the word 'taxpayer,' is to be construed generally, not literally. It includes, in fact, freeholders and tenants, both resident and nonresident, citizens and electors. It also includes a nonresident and nonfreeholder municipal income taxpayer."

The presence of the unequivocal statement of the court

that the word taxpayer "includes a nonresident and non-freeholder municipal income taxpayer" brings the inevitable conclusion that appellants' assignment of error no. 1 is not well taken and is therefore overruled.

II

"The judgment of the trial court holding that the provisions of Section 23 of the Columbus City Charter prohibit the council of the city of Columbus from establishing the rates and charges for service furnished by municipally-owned utilities by emergency ordinance, is contrary to law."

Reference to a "decision" of the trial court, filed January 21, 1971, indicates that the court decided the issue of regularity in the passage of ordinance no. 1687-70, and held that under section 23 of the charter of the city of Columbus it could not be passed as an emergency measure and was therefore inoperative. The decision indicated the intention of the trial court to grant a permanent injunction restraining the collection of the new rates imposed by the ordinance held to be inoperative. The injunctive relief was ordered in a judgment entry filed February 23, 1971, which contained, also, orders growing out of leave granted to file a supplemental complaint, February 8, 1971, which was done February 9, 1971.

The troublesome questions raised by this assignment of error grow out of the language employed in section 23 of the Columbus city charter, which reads, in part, as follows:

"Ordinances appropriating money may be passed as emergency measures, but no measure making a grant, renewal or extension of a franchise or other special privileges, or regulating the rate to be charged for its service by any public utility, shall ever be so passed."

Sewer rates were increased by ordinance no. 1687-70, which was passed by the city council as an emergency measure. The contention of the taxpayer is that the emergency method was improperly used in the passage of the ordinance, it being a measure dealing with "the rate to be charged for its service," and that the emergency

method was denied by section 23 to "any public utility." The public-utility character of the sewage system of the city of Columbus needs careful examination.

"Public utility" is a generic term in common use. It encompasses some generally recognized and accepted concepts. It suggests the devotion to public use of the owner's product or service, that the product or service is available to the public generally and indiscriminately, and that the producer of the product or service stands ready to serve an indefinite public which has a legal right to receive the product or service furnished. The term contemplates a privately owned utility, many of which operate under a franchise, and a publicly owned operation, such as a municipal water or sewage disposal system. Both kinds are "public utilities" and both quite commonly enjoy a monopolistic position. (Discussed in *Motor Cargo, Inc.,* v. *Board of Township Trustees* [1953], 67 Ohio Law Abs. 315.)

The framers of the charter for the city of Columbus contemplated the ownership and operation of public utilities by the city. Specifically, section 115 provides that the director of public service shall have charge of the construction, improvement, repair and maintenance of "sewers, sewage disposal plants and farms." Section 116 provides further that "He shall manage and control * * *, sewage disposal plants and farms, [and] all public utilities of the city, * * *." The matter of the fixing of rates for services is covered also in the charter. Sections 120 through 124 pertain to the determination of rates for water services. Section 120 provides for the fixing of water rates and charges to cover operating expenses of the city waterworks. The concluding sentence in the section reads as follows:

"Such rates of charge shall be fixed by ordinance of council. It shall be made in an equitable manner and in such amount as will fully cover the cost of service."

These sections have meaning in the instant case by reason of section 126, titled, "Rates and charges for service furnished by municipally-owned utilities." It pro-

vides that the water rates sections "shall apply as far as practicable in the sale and disposition of the service of all other public utility plants owned and operated by the city," and adds, "except that as to any such service furnished in competition with a privately owned plant, the rate shall be such as in the opinion of council tends best to develop and increase the business, to increase the load factor and to promote in other ways the general success of such utilities." (Adopted August 14, 1917.)

At this point, it is clear that charter framers were cognizant of the two classes of "public utilities" and that the city council would be obliged to deal with both classes. The distinction continues to be made in later charter pronouncements. Section 192 provides for the granting of franchise to private companies to furnish products or services within the city. More recently, on November 3, 1953, in section 192-1, provision was made for a department of public utilities and the appointment of a director for the department. His duties are prescribed, as follows:

"* * * The director shall exercise the administrative powers of the city in relation to privately-owned mass passenger transportation companies and all other privately-owned public utilities operating within the city. He shall not have control over or exercise administrative powers of the city with respect to the Columbus division of water, the Columbus division of electricity and any other municipally-owned or operated utilities. * * *"

If further support is needed to make clear the two types of public utilities with which public agencies deal it is found in R. C. chapter 4905. R. C. 4905.02 defines a public utility, with which the state public utilities commission is concerned, as those named in R. C. 4905.03, and others, "but excepting such other public utilities as operate their utilities not for profit, such other public utilities as are owned or operated by any municipal corporation * * *." The commission's jurisdiction and duties is to "extend to every public utility and railroad," but a municipally owned public utility is not a "public utility" under R. C. 4905.02.

This issue needs to be narrowed. Distinctions are clear. A city operates its own municipal public utilities and it deals with privately owned public utilities. Such fact is reflected in the language used in section 23 of the charter, and in the contrasting term employed in section 120. Section 23 speaks of "regulating the rate to be charged" "by any public utility." Section 120, referring to water rates, and by way of section 126, referring to sewage system rates, as "fixed by ordinance of council." The difference must not be lost. A municipality will "fix" the rates to be charged by its own public utilities, but it may only "regulate" those charged by "any public utility." Section 23, indicating the subjects for emergency ordinances, excepts only rate "regulation" of private public utilities.

The trial court is quite correct in concluding that a municipally-owned sewage disposal system is a public utility. It is, however, in a distinct class of public utility with which the Ohio Constitution and legislative enactments have dealt with particularly. The cases upon which the trial court relied to establish that the Columbus plant was a public utility deal particularly with those legislative and constitutional provisions. For example, *Mead-Richer* v. *Toledo* (1961), 114 Ohio App. 369. It does say that a city owned sewage system is a public utility, but it particularizes. It states that it "* * * is a public utility within the purview of Section 4, Article XVIII of the constitution." A part of that constitutional provision, which particularly empowers a municipality, reads as follows:

"Any municipality may acquire, construct, own, lease and operate within or without its corporate limits, any public utility the product or service of which is or is to be supplied to the municipality or its inhabitants * * *."

The reference by the court is to R. C. 729.49, which bears upon the operation of the municipally-owned public utility, is found at page 371; a portion of the quote from that section reads as follows:

" '* * * The legislative authority may change such rates or charges from time to time as is deemed advisable: The legislative authority of a municipal corporation oper-

ating under a charter may establish such schedule of rates and provide for its administration by designating the department or officer to be charged with the enforcement of Sections 729.49 to 729.52, inclusive, of the Revised Code.' "

The full import of what the court is holding comes from a proposition of the court at page 374, as follows:

"It cannot be questioned that the operation of a city sewage system is a municipally-operated public utility on the local level, and that Section 4, Article XVIII of the Constitution is direct authority and self-executing and cannot be limited by statute. * * *"

Likewise, the nisi prius case noted by the trial court, *Dennison* v. *Martin et al., Trustees* (1964), 4 Ohio Misc. 1, holds that the joint effort of the village of Dennison and the city of Uhrichsville to provide a sewage disposal system is a public-utility effort. But, the court holds that it is such, and, therefore, the operation is controlled by R. C. 729.49 and 729.52. Such concepts bear no relation to the problem presented in the case before this court arising out of section 23 of the charter of the city of Columbus.

Appellants' second assignment of error is well taken. The trial court erred in holding that ordinance no. 1687-70 was not subject to emergency treatment under section 23. The ordinance was properly passed and is valid and subsisting.

### III

"The judgment of the trial court holding that sewer tapping permits must be issued on a 'first come, first serve' basis even where existing sewer capacity is not sufficient to permit development of all land in the area designed to be served by said sewer is contrary to law."

In a sense, the consideration of this assignment of error is unnecessary for several reasons; for one, the sustaining of appellants' assignment of error no. 2, finding the passage of ordinance no. 1687-70 in accordance with charter provisions concerning emergency measures, makes it moot. In the second place, the temporary restraining order was modified by agreement before this court to permit the collection and impounding of permit fees, at the

new rates, pending disposition of the cause. This was admitted at oral hearing to have been done, and the fund is presently in existence.

Because of the possibility that questions of more than usual importance are raised concerning the use of the "freeze" method, attention is directed to this assigned error.

The action in this case began with the filing of the original complaint by a taxpayer who sought an injunction restraining the collection of increased utility service rates for sewage disposal which were claimed to have been unlawfully imposed. Such an action was proper under sections 71 and 74 of the city charter. The sections read, respectively, as follows:

"The city attorney shall apply, in the name of the city, to a court of competent jurisdiction for an order of injunction to restrain the misapplication of funds of the city, or the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the city in contravention of law, or which was procured by fraud or corruption."

"In case the city attorney, upon written request of any taxpayer of the city, fail to make any application provided for in the preceding three sections [one of which is Section 71], such taxpayer may institute suit or proceedings for such purpose in his own name on behalf of the city. * * *"

The taxpayer under these sections could properly seek an injunction against a (1) misapplication of funds, (2) abuse of the city's corporate powers, and (3) the execution or performance of a contract made in contravention of law or procured by fraud or corruption. There is no allegation of dishonesty, fraud or corruption, nor any attempt to prove such. There could only be then one predicate for the taxpayer's action—an abuse of corporate powers.

The finding of this court, as reflected in the discussion of assignment of error no. 2, eradicates that contention as respects the allegations of the original complaint. The

holding of the trial court, to which objection is made in this assignment of error, has nothing to do whatever with the disposition of the issue made by the original complaint; it arises out of subsequent procedural developments. By permission of the trial court a supplemental complaint was filed February 5, 1971, complaining that Mr. Cremean, the service director for the city, had accomplished a "freeze" on water and sewer taps. An intervening party, Virginia Homes, Inc., was permitted by the court, and a party defendant added Paul J. Schooley, assistant safety director. Then followed a second supplemental complaint about another "freeze" imposed on the issuance of building permits where the applying party would require a water or sewer tap.

In its entry filed February 23, 1971, the trial court held that any citizen of Columbus has a legal right to a building and sewer permit if he has complied with all legislative and regulatory requirements. The court then ordered as follows:

"* * * Accordingly, defendants Schooley and Cremean should be and are enjoined from their respective freezes and may not, at their discretion, refuse to issue building and sewer permits on a first-come first-serve basis. * * *"

It is difficult to determine, after the supplemental filings and additions of parties, whether the "taxpayer," Willits, complains of the "freeze" as an abuse of corporate powers to which he has been subjected and from which he has suffered, or if it is now Virginia Homes, Inc. which is the suffering "taxpayer" which brings the action. No attempt is made to resolve that quandry.

Any discussion of this particular assignment of error cannot fully exclude reference to assignments of error numbered 5 and 6, although it will be attempted, hoping for some indulgence from the reader.

It is noted, and emphasized, that the original action was brought by a taxpayer as a class suit, and has peculiar characteristics. Such a suit "is a privilege recognizable and exercisable only in a public capacity, and the result to be accomplished must be of benefit to the public

within the taxing district. A taxpayer cannot sue in this capacity for the protection of a purely personal right or the redress of a purely personal grievance in which other taxpayers have no interest." (52 Ohio Jurisprudence 2d 35, Section 24.) See also *Williams* v. *Wilmington (City)* (1960), 85 Ohio Law Abs. 398.

A taxpayer brings an action on "behalf of a municipality." A taxpayer's right to bring an action is conferred by statute, and in this instance, by charter provision as well. The taxpayer brings the action in a public capacity. His interest in the result to be accomplished is the same as that of all of the other taxpayers within the taxing district, or area affected by the misapplication of funds, abuse of corporate powers, or involvement in an illegal contract by the officers acting for the area.

The Columbus charter section 73 also provides a method to compel any officer to perform a duty required by law, the issuance of a building permit for example. Under section 74 the citizen can bring the action if the city attorney does not.

In this case the concern is an abuse of the city's corporate powers, since no misapplication of funds or illegal contract is involved. Taxpayer actions, involving an abuse of corporate powers, are carefully restricted by court decisions. A minor limitation is suggested by a decision in *Vadakin, on behalf of the City of Newark,* v. *Crilly* (1905), 7 C. C. (N. S.) 341, affirmed in 73 Ohio St. 380, to the effect that the taxpayer should have unselfish motives. A somewhat reverse restriction comes from those cases and establishes that public officials who act in good faith, and cannot be accused of fraud or collusion, have a range of discretion which courts respect and such court will not substitute their judgment for that of the public official.

Typical of those cases is *State, ex rel. Schaefer, a Taxpayer,* v. *Zangerle, County Aud.* (1932), 43 Ohio App. 30, dealing with county commissioners who in an official act determined a matter of fact. In paragraph three of the syllabus the language is as follows:

"Where county commissioners acting in good faith

determined that certain improvements were necessary as approaches to bridge, court could not substitute its judgment for that of commissioners."

City officials are involved in *McClain* v. *McKisson, Mayor* (1898), 8 C. D. 357, affirmed in 54 Ohio St. 673. The court held that the officials have discretion in accepting or rejecting bids for a waterworks in the absence of fraud and collusion. Our Franklin County Common Pleas Court recognized the principle in *Fergus* v. *Columbus* (1898), 6 N. P. 82, saying that the service director had discretion in the awarding of a contract relative to the waterworks.

These decisions suggest that this action, directed to an abuse of the city's corporate problems, focuses attention on the question of an abuse of discretion by the service director. It is difficult to see how the raising of rates, in order to pay the operating expenses of the sewage disposal system, and to provide for the necessary expansion of the system in a growing community, which system in the opinion of the director is now overloaded, constitutes an abuse of discretion. No case has been cited, or discovered in the course of this review, that so holds.

Even the case of *Butler, a Taxpayer,* v. *Karb, Mayor* (1917), 96 Ohio St. 472, cited by the appellees, says in paragraph one of the syllabus:

"* * * and in the management and operation of such plant municipal officials are permitted wide discretion. * * *"

Procedural ground rules pretty well limit the taxpayer in actions such as this one. The case of *Lakewood* v. *Rees* (1936), 51 Ohio App. 490 concerns a suit brought by the city solicitor at the request of a taxpayer. Procedural maneuvering ensued. The court disposed of the unhappy taxpayer, who attempted to intervene in the suit because it wasn't going to suit him, saying in the syllabus:

"A taxpayer may not intervene in a pending action, brought by a solicitor or director of law in pursuance of a demand by a taxpayer to prevent the misapplication or misappropriation of municipal funds, upon the claim that

the circumstances are such that an honest, fair and vigorous prosecution of the case is improbable.''

*Cincinnati* v. *Kellogg* (1949), 86 Ohio App. 518 was an action filed by the city solicitor for a taxpayer to enjoin giving effect to an ordinance. The taxpayer tried to intervene and his request was denied. The court held that the taxpayer was not invested with a right to intervene, that he could have been permitted to do so as a ''proper'' party but he was not a ''necessary'' party. Only when a solicitor is not proceeding in good faith, or with diligence does a court have an inherent power to allow the taxpayer to intervene, and then the intervention does not change the character of the cause of action; so the court held in *Middletown* v. *City Commission of Middletown* (1941), 138 Ohio St. 596.

These were all cases in which ''the'' taxpayer attempted to intervene. The intervenor in this case is not ''the'' taxpayer but ''a'' taxpayer, which corporate person complains about a ''freeze'' on water and sewer tap permits. Just what relation such charge has to the original action filed to enjoin a rate ordinance comes only from the suggestion of the plaintiff-realtor that such ''freeze'' was ''retaliatory'' punishment inflicted by the director because of the filing of the taxpayer action. Assuming that plaintiff-realtor is correct, the observation might be made that good-faith protection of a rate ordinance might well not be regarded as an abuse of discretion.

There can be no possible objection to one proposition advanced by plaintiff-realtor and approved by the trial court in holding that a citizen has a legal right to a building permit and a sewer permit *if he has complied with all legislative and regulatory requirements.* Appellees' case in support of their position is *State, ex rel. Mumma,* v. *Stansberry* (1964), 5 Ohio App. 2d 191. The proposition of the court is as follows:

''Where a property owner complies with all the legislative requirements for the procurement of a building permit, there is a clear duty on the part of the officer charged therewith to issue it.''

This basic proposition is taken from the decision of the Supreme Court in *Gibson* v. *Oberlin* (1960), 171 Ohio St. 1, in which case the city changed a zoning ordinance after withholding a building permit.

The same basic rule was followed in *Henle* v. *Euclid* (1954), 97 Ohio App. 258, in which case the city withheld a permit because it wanted the property for a freeway, and in *State, ex rel. Sun Oil Co.,* v. *Euclid* (1955), 164 Ohio St. 265, where a limited access highway was anticipated.

Not one of these actions was a class action instituted by a "taxpayer." The route was by way of mandamus. An applicant has been denied a permit for which he had qualified under existing legislation and regulation. The petitioner or complainant was not talking for others of a class. If Virginia Homes, Inc. has been denied building, water, and sewer permits, it is not as a representative of a class that it may complain, but as a single citizen which has been refused a permit for which it qualifies and which the city official has a clear legal duty to grant. The redress of such an individual right is reached by mandamus, or perhaps by appeal, or by mandatory injunction, or all three filed simultaneously, as has been suggested by the Ohio Supreme Court in past decisions.

It is significant that the cases cited by appellees, and upon which they rely in support of the proposition that a citizen is entitled to a permit when he has met regulatory and legislative requirements, are actions in mandamus, except *VMJ Company, Inc.,* v. *Lorain* (1957), 105 Ohio App. 166, which was an action for a declaratory judgment. The court in that case, which concerned a 26-unit shopping center with 9 units in the city and 17 outside, makes a most pertinent observation which stresses the point that applications for permits cannot be class actions. Individual situations differ and individuals must prove they have a clear legal right to the permit sought. The language of the court in paragraph five of the syllabus, is as follows:

"A 'shopping center' * * * does not satisfy the requirement of an entire continuous building wholly in an inhabitant's occupation, so that the owner of the shopping center can compel sewer and water service for the use of the sepa-

rate storerooms which are outside the city limits and which are to be rented or leased to others."

A Massachusetts Supreme Court case, *Clark* v. *Board of Water & Sewer Commissioners of Norwood* (1968), 234 N. E. 2d 893, was an action in mandamus to secure a permit for a 318-unit apartment house. The court found the town to have reasonable sewage capacity and had no discretion to refuse a sewer connection.

Again, in *COS Corporation* v. *Evanston* (1963), 190 N. E. 2d 364, the complainant sought a writ of mandamus to obtain a building permit. The Supreme Court of Illinois held it was entitled to rely on zoning requirements as existing at the time of application and could not be denied a permit because they were changed thereafter. Likewise, in the Ohio case of *State, ex rel. The Ice & Fuel Co.,* v. *Kreuzweiser* (1929), 120 Ohio St. 352, a writ was allowed where the building inspector had denied a permit because he anticipated restrictions to be enacted in the future.

Appellees also rely upon an Arizona case, *Travaini* v. *Maricopa County* (1969), 450 P. 2d 1021. The court held:

"Mandamus is proper remedy to compel [a] municipal corporation as owner of [a] sewer line to allow [a] property owner to tap into existing sewer lines."

The court said that the city could not "unreasonably" deny "a property owner" a right to connect.

It is important to note that the court said that the permit must be granted to "a property owner"—not a taxpayer indirectly or remotely affected, but *a property owner* adversely affected and confronted with loss of value by a denial of due process.

Finally, counsel for appellees also cite *La Salle National Bank* v. *Riverdale* (1959), 157 N. E. 2d 7, a case in which mandamus was sought to secure a building permit. The basic position taken by the Supreme Court of Illinois is thoroughly sound. Paragraph 3 of the syllabus reads as follows:

"The control of the use of public sewers is a matter affecting the public health and safety, and is subject to reasonable and equitable regulation by a municipality for such purposes, and owners of property assessed to pay for

public improvement must comply with any reasonable regulation imposed by the municipality on such use."

Note that the court makes this pronouncement of the broad principle involved and then addresses itself to the facts before it. It appears that certain landowners were denied building permits while permits were granted to others for a similar use. Such a situation, says the court, "would result in gross violation of both the state and federal constitutional guaranties against deprivation of property without due process of law." Again, this court makes it clear that the issuance of a building permit is an individual matter not to be resolved in group action. The Illinois court puts it as follows:

"* * * a writ of mandamus should not have been issued to require the village to approve the connection unless and until plans and specifications therefore were submitted and made definite and certain."

The fact pattern in *La Salle* is, of course, not a "freeze" situation. A "freeze" involves no discrimination but neither does it call for "taxpayer" action. The "freeze" affects only those individuals who for purposes of their own seek a permit.

In examining the appropriateness of the intervention of Virginia Homes, Inc., in this action, attention must be given to the provisions of R. C. 733.581, permitting a "taxpayer" to intervene. The section lends encouragement to the intervenor in this case. Upon written request, as in R. C. 733.56, 733.57, and 733.58, the taxpayer may be named a party defendant "and if so named shall have the right to assist in presenting all issues of law and fact to the court in order that a full and complete adjudication of the controversy may be had." R. C. 733.581 states, in part:

"In any civil action or proceeding involving the public interest the court shall grant the application of any person to intervene if the court believes that the public interest will be better protected or justice will be furthered."

This statutory provision is noted in a decision by the United States District Court, Northern District of Ohio, Eastern Division, in *Cleveland* v. *Cities Service Oil Co.* (1969), 20 Ohio Misc. 179. A taxpayer sought to intervene

in several suits filed in the federal court to recover amounts owed the city of Cleveland for the use of its airport facilities. There are many ramifications to the procedural pattern and the decision is an excellent treatise on Rule 24 (b) of the Federal Rules of Civil Procedure. Important to us are the conclusions reached by the court. The court says that permissive intervention is to be liberally granted under Rule 24 (b). Paragraph two of the syllabus reads as follows:

"Under Rule 24 (b) of the Federal Rules of Civil Procedure, a motion to intervene should be granted where the applicant states claims or defenses which have an issue of law or fact in common with the main action and its allowance will not unduly delay or prejudice the original parties."

(See also the discussion by the court beginning at page 184, etc.)

We are of the opinion, and we so hold, that the intervening party in this case, Virginia Homes, Inc., an applicant for building permits delayed by a "freeze" stated no claim or defense which had any issue or fact in common with the main action filed by "taxpayer" Willits who sought an injunction to prevent the application of a rate increase ordinance claimed to have been illegally passed, the operation of which affected all of the users of the municipally-owned public utility. Likewise, the intervention did delay the original parties unduly, and delay results quite generally in prejudice.

The only suggestion of a relationship between the original action and the supplemental complaint is that the "freeze" was retaliatory. Assuming it to be such, that cannot be said to be an issue or fact in common with the main action. And standing alone, a service director who attempts to protect the solvency and efficiency of the utility for which he is responsible cannot be said to be chargeable with an abuse of discretion, especially when confronted with an attempt by the users of the service to keep dollars in their personal pockets by defeating what he believes to be a necessary rate increase.

It was error for the trial court in this action to grant

a mandatory injunction requiring the issuance of building permits on a first-come, first-serve basis without first determining that property owners Virginia Homes, Inc., and any other, had a clear legal right to a permit. Such an order further ignores the proposition that administrative public officials may exercise reasonable discretion in the discharge of their duties. The blanket order denies, also, the possibility that in individual cases an application may be denied today for a good reason (like one resulting from a condition which confronts utility over which it has no control) and considered at a future date. In such situations there is no abuse of discretion.

The issuance of a permit is not a matter for a class action and is in no sense a proper subject for a "taxpayer" suit.

Appellants' third assignment of error is well taken and sustained. (Note: intervention is further discussed under the fifth assignment of error.)

### IV

"The trial court abused its discretion by refusing to journalize its decision of January 21, 1971, until February 23, 1971, where it had no intention of altering or amending said decision."

Appellants' major complaint is that the trial court held a formal journal entry, predicated upon its decision filed January 21, 1971, for filing until after the announcement of its second decision on February 23, 1971. In the interim, procedural events fully discussed herein occurred.

Courts have wide discretion in control over the entries through which they speak. And who can say what the intention of the court really was except the court?

In view of the results reached in this decision, if the retention of the entry should be an abuse of discretion, which can hardly be so applying the definition of such announced by Ohio courts, the error cannot be said to be prejudicial.

This assignment of error is overruled.

### V

"The judgment of the trial court permitting intervention and substitution of a new party plaintiff and new de-

fendants and the filing of two supplemental complaints alleging new and different causes of action after a complete hearing on the merits of the original complaint and the rendition of a decision granting plaintiff in the original complaint all the relief prayed for was contrary to law and an abuse of the trial court's discretion."

Discussion of this assignment of error involves a consideration of certain Ohio rules of civil procedure. Those noted, and to which attention is directed, are rule 23, "Class Actions"; rule 24, "Intervention"; rule 14, "Third-Party Practice," section B, "When plaintiff may bring in third party"; and rule 15, "Amended and Supplemental Pleadings," section (E), "Supplemental pleadings."

Because of the limited decision law in Ohio, reference is to the comparable federal rules, furnishing the pattern for Ohio rules, for discussion and a sampling of cases supplied in Federal Practice and Procedure, volumes 1A and 2, by Barron and Holtzoff as revised by Wright (1960). It is noted again that this is a "taxpayer" suit—a class action. At volume 2, page 253 (rule 23), it is suggested that the characteristics of such an action are "common interest" and a "common grievance." Three classes of group actions are described: A "true" class action, in which the right to be enforced is a "joint" or "common" right (page 266, section 562.1); a "hybrid" action, in which appear individual causes, or interests, but there is no right to a common fund or common property (page 272, section 562.2); and, a "spurious" action, characterized by plaintiffs with separate and distinct rights and consequently separate causes of action, each plaintiff having no right in a common fund or interest in common property (page 274, section 562.3).

If the case here for review is a "class" action it is a "spurious" one, and, therefore, not entitled to be regarded as a class action. This underlying characteristic, or fact, has direct bearing upon the questions of intervention and supplemental pleadings.

The intervention of parties and the use of supplemental pleadings are closely related. Rule 24 is discussed,

beginning at page 354 of volume 2. It is proper to intervene, says the text material, when the intervenor's claim, or defense, and the existing action have a question of law or fact in common (page 388, section 601). Permission to intervene is largely discretionary, and to be exercised carefully. One of the principal questions to be decided by the court is whether the intervention will unduly delay or prejudice the rights of the original parties (page 398, section 602).

In this cause it may be inferred, if it isn't perfectly obvious from the record, that the intervenor was brought into the case by the original plaintiff. Ohio rule 14 (B) is addressed to such a situation, the federal rule (volume 1A, page 639) reads exactly the same. The rule is as follows:

"When a counterclaim is asserted against a plaintiff, he may cause a third party to be brought in under circumstances which under this rule would entitle a defendant to do so."

A court may permit a supplemental pleading. At page 816, section 455, volume 1A, the textwriters discuss federal rule 15. Pertinent language of the text reads as follows:

"* * * Fundamentally, a supplemental pleading is a mere addition to, or continuation of, the original complaint or answer. Its purpose is to enable the pleader to include in the record new facts that have been accrued since the commencement of the action and which will modify the amount or nature of the relief sought in the original pleading. It is designed to obtain other or further relief along the same lines and based on the same subject matter, as set out in the original complaint.

"Some cases hold that a supplemental pleading should not set forth a new 'cause of action' either as a substitute for the original claim or in addition thereto. * * *"

The classic example of proper supplemental pleading is illustrated by the case of the plaintiff who sued to recover his mare which foaled after the action was started.

A supplemental pleading was permitted to recover the colt.

A few of the cases cited by the textwriters are included here to develop the fundamental rule announced. A Missouri district court decision in *Berssenbrugge* v. *Luce Mfg. Co.* (1939), 30 F. Supp. 101, says that " 'supplemental pleading' is designed to cover matters subsequently occurring but pertaining to the original cause." Such pleading is an addition to or continuation of the original complaint. The exact same rule is followed in *Bowles* v. *Senderowitz* (1946), 65 F. Supp. 548.

A United States sixth district court of appeals case, *Hillgrove* v. *Wright Aeronautical Corporation* (1945), 146 F. 2d 621, is an action charging fraud in the making of claims, and other acts of fraud were sought to be included in the original action. The court held that any new act of the same identical kind "subsequently occurring but pertaining to the original cause may be set forth by supplemental petition."

In an action for a declaratory judgment seeking to have an Arizona statute made unconstitutional, *Southern Pac. Co.* v. *Conway* (1940), 115 F. 2d 746, the ninth district court of appeals refused to accept a supplemental complaint because, "the office of a 'supplemental complaint' is not to set forth newly discovered evidence justifying a new trial, but to bring into record new facts which will enlarge or change kind of relief to which plaintiff is entitled."

The United States Supreme Court decided a case in which gas consumers in Arkansas sought refunds of payments made for service unlawfully imposed. In *Texarkana, Tex.,* v. *Arkansas, Louisiana Gas Co.* (1939), 59 S. Ct. 448, the court allowed Texas consumers to file a supplemental complaint. The court said:

"Where a good cause of action is stated in an original bill, a supplemental bill setting up subsequently occurring facts which justify other or further relief is proper, even after remand for further proceedings."

*Randolph* v. *Missouri-Kansas-Texas R. Co.* (1948), 78 F. Supp. 727, is interesting. It involves a class action. One of the railroad brotherhoods sought to restrain the

employing railroad from changing an employment contract. A supplemental complaint was tendered claiming that the defendant railroad threatened to fire members of the union. The motion to permit the filing was overruled. The court held that a supplemental complaint "must be based on the same cause of action as the original complaint, and a supplemental petition cannot be used to try new matter or a new cause of action."

Finally, a slightly different phrasing of the rule appears in *United States* v. *Southern Pac. Co.* (1947), 75 F. Supp. 336. The changes sought to be introduced in this pending cause, by way of a supplemental complaint, reflected political and economic factors affecting the operation of a railroad. The court held that although no attempt was made to file such a pleading in the trial court it would have been improper anyhow, and equally improper in the court of appeals. The court summarized, as follows:

"A new and distinct lawsuit should not be injected into the case by allowing a supplemental pleading."

In connection with this group of cases, *Cleveland* v. *Cities Service Oil Co., supra,* should be read and the rules announced noted.

It was error to permit Virginia Homes, Inc., to intervene in the original cause filed by the "taxpayer" Willits. The position of the plaintiff was not such as to permit the third party to be brought in under Ohio civil rule 14 (B). The supplemental pleading permitted to be filed, after Virginia Homes became a party, did not reflect a question of law or fact in common with the original complaint praying for an injunction to defeat the imposing of higher rates for sewage service.

Virginia Homes, Inc., brought a new and distinct lawsuit into the picture, designed primarily to secure water and sewage taps and building permits, not for the "taxpayers" represented by Willits but for the "landowners," especially Virginia Homes, and others if there were such, all of whom could have and were obliged to seek redress in a distinct lawsuit.

Appellants' fifth assignment of error is well taken.

## VI

"The judgment of the trial court overruling defendants-appellants' motion to dismiss plaintiffs-appellees' second supplemental complaint at close of plaintiffs-appellees' case and at the conclusion of defendants-appellants' case for failure of proof was contrary to law."

In its judgment entry of February 23, 1971, the trial court ordered:

"* * * defendants Schooley and Cremean should be and are enjoined from their respective freezes and may not, at their discretion, refuse to issue building and sewer permits on a first-come first-serve basis. * * *"

This assignment of error is directed toward the court's refusal to dismiss plaintiffs' second supplemental complaint. Two paragraphs in that pleading need be noted. Paragraph 6 sets out the claim of "retaliation" on the part of the director. It alleges that the director attempted to make moot the Virginia Homes claim set out in the first supplemental complaint by rescinding a small portion of the water and sewer tap freeze, and then directing that a blanket freeze be imposed on building permits. Paragraph, No. 7, reads as follows:

"Many citizens of Columbus have applied for and will continue to apply for the aforesaid 'frozen' permits and city services. These citizens have a clear legal right to receive building permits and the City's water and sewerage services without delay."

The allegations of the "taxpayer" in his supplemental complaint clearly indicate no common interest with him as a taxpayer. The concern is not of taxpayers but of "many citizens" who have applied for and "will continue to apply for" permits and city services. The allegation is that they have a clear legal right to those permits and says nothing whatever about compliance with legislative and regulative requirements.

Not one syllable alleges a fact "which modify the amount or nature of the relief sought in the original pleading." (Quotation ante from volume 1A, page 816, §455.)

The new facts alleged will enlarge and change the kind of relief sought by the original plaintiff.

The second supplemental complaint brings into the case a new cause of action. As indicated ante, an individual property owner has a cause of action in mandamus to accomplish performance of a clear legal duty. "Many citizens" cannot rely upon a "taxpayer" action to secure permits for buildings and services. As individual property owners they have a right of appeal under R. C. chapter 2506 and may seek mandamus or a mandatory injunction as counsel may see fit. No remedy is available by virtue of a class action, especially not by way of a "taxpayer" suit.

If the intervenor had no right to intervene, and the second supplemental complaint was not proper, as this court has already held, then the trial court erred in not dismissing that complaint regardless of the quantum of evidence.

Appellants' sixth assignment of error is well taken.

Conclusion

For the reasons advanced the judgment of the trial court is reversed and the permanent and temporary injunctions granted dissolved and held for naught.

*Judgment reversed.*

WHITESIDE and REILLY, JJ., concur.