THE STATE, EX REL. LEMAITRE ET AL., APPELLEES, *v.* CITY OF CLYDE ET AL., APPELLANTS.

[Cite as State, ex rel. Lemaitre, *v.* Clyde (1983), 6 Ohio St. 3d 344.]

(No. 82-1513—Decided August 31, 1983.)

*Messrs. Bennett & Knight* and *Mr. Frank H. Bennett,* for appellees.
*Mr. William D. Pearce,* city solicitor, for appellants.

*Per Curiam.* Following the stipulations by the parties at the trial level, the only issue for determination is whether the ordinance passed by the city council was a subject matter which by its nature is excluded from the provisions providing for the passage of emergency ordinances by the Charter of the city of Clyde.

Appellants assert that the ordinance is subject to enactment as an emergency ordinance based upon two grounds: (1) that the prohibition in Section 4-6 applies only to regulation of rates charged by privately owned public utilities and that a municipally owned water treatment plant is not a public utility within the contemplation of the section; and (2) that the ordinance does not directly regulate the "rate to be charged for public utility service," in that it merely grants the power to do so to the city manager. Appellants rely on *Columbus, ex rel. Willits,* v. *Creaman* (1971), 27 Ohio App. 2d 137 [56 O.O.2d 310], for their contention that a municipally owned water treatment plant is not within the purview of city charter Section 4-6. In *Willits,* the Court of Appeals for Franklin County was called upon to construe a Colum-

bus City Charter provision similar to the one in the present case. That court held in paragraph two of the syllabus, that:

"A provision in a city charter prohibiting a 'public utility' from enacting legislation of an emergency nature regulating the rate to be charged for its service does not apply to the increasing of sewer rates of a municipally owned utility by a city council."

The court of appeals noted a distinction existed between privately and publicly owned public utilities in the Columbus City Charter.

No such distinction exists in the Charter of the city of Clyde. The charter makes no other mention of public utilities outside the bounds of Section 4-6. The court of appeals, in the present case, correctly pointed out that the language construed in *Willits* did not involve the words "public utility service," but rather the words "public utility." The use of the term "public utility service" connotes a broader spectrum of inclusion by the provisions of Section 4-6, in the present case, than by the charter provision construed in *Willits*. For these reasons *Willits* can be distinguished on its facts.

This court expressed in *Britt* v. *Columbus* (1974), 38 Ohio St. 2d 1 [67 O.O.2d 1], at paragraph two of the syllabus, that:

"A sewerage system owned and operated by a municipality for the benefit of its inhabitants is embraced within the term 'public utility' * * *."

In light of the foregoing, this court finds that the term "public utility" includes both publicly and privately owned utilities. Applying this finding to Section 4-6, we conclude the terms of the section excluding ordinances dealing with the regulation of rates "to be charged for public utility service" from the provisions of an emergency ordinance must be honored. The right of referendum[4] is a primary right of the citizenry of Ohio for the redress of their grievances against the governmental bodies which regulate their freedoms. As such, the right must be accorded the utmost protection, and any conflicts which arise concerning the availability of referendum, in relation to a particular ordinance, should be resolved in favor of preserving the right of referendum. In the present case, the court is compelled to interpret Section 4-6 as a conscious preservation of the right of referendum by the electorate of Clyde, which must be read in its literal sense, as a bar to the emergency passage of Ordinance No. 1981-68.

As to appellants' argument that the ordinance is not a regulation of the utility rates, which is barred by Section 4-6, but a mere grant of power to the city manager to regulate rates in the future, this court agrees with the trial court that such argument is "* * * really a distinction without a difference."

Thus an action in mandamus is proper to compel the filing of the referendum petitions presented by appellees to appellant Scheer.

The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

---

[4] See Section 1f, Article II of the Constitution of Ohio, and R.C. Chapter 731.

CELEBREZZE, C.J., W. BROWN, SWEENEY, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.

LOCHER, J., dissents.

LOCHER, J., dissenting. The majority correctly states that the issue in this case is whether the Clyde City Council properly termed Ordinance No. 1981-68 as an emergency measure. The resolution of that issue hinges upon analysis of the following *sentence*: "No legislation involving the *levying of a tax, granting, renewing or extending a franchise or regulating the rate* to be charged for public utility service shall be passed as an emergency measure." (Emphasis added.) Section 4-6 of the Clyde Charter.

In order to understand that provision, it is essential to read its language in context. That is, this section of the charter excludes three legislative areas from the "emergency measure" category: taxation, franchising utility services to private entities and utility regulation. Each of these necessarily involves governmental supervision of private sector activities. The city cannot tax itself. Likewise, the city cannot establish a franchisor-franchisee relationship with itself. Most importantly for this case, a city cannot regulate its own activities. Rather, the term "regulating" connotes a relationship in which one entity has a superior position over another.

On its face, therefore, Section 4-6 of the charter prohibits emergency measures which would affect private interests only.

The majority's interpretation of this provision is, therefore, strained. This results from reading the words "public utility" out of context.

For example, the majority cites *Britt* v. *Columbus* (1974), 38 Ohio St. 2d 1 [67 O.O.2d 1] (paragraph two of the syllabus), as supportive of its position. Yet, the majority fails to quote paragraph two of the syllabus in its entirety: "A sewerage system owned and operated by a municipality for the benefit of its inhabitants is embraced within the term 'public utility' *in Sections 4 and 6 of Article XVIII of the Ohio Constitution*." (Emphasis added.) What the majority fails to mention is that Article XVIII of the Ohio Constitution deals exclusively with municipal corporations and their powers — including home rule.

Section 4 of Article XVIII empowers municipalities to own and operate utilities. Section 6 of Article XVIII establishes criteria for the sale of the "surplus product" of a municipal utility. In that context, therefore, the *Britt* court's construction of the term "public utility" is sensible.

Conversely, the Revised Code contains a definition of "public utility" which would serve appellants' purpose: " 'Public utility' means every one as defined in divisions (A)(1), (2), (4), (5), (6), (7), (8), (9), and (14) of section 4905.03 of the Revised Code, including all telephone companies, but excepting * * * *such other public utilities as are owned or operated by any municipal corporation* * * *." (Emphasis added.) R.C. 4911.01 (A). That provision is part of a chapter which establishes the consumers' counsel. The con-

text, therefore, determines the meaning of "public utility" in each of these examples. Basic principles of construction require, therefore, that we consider the common meaning of the term "public utility" and its context in this case.

The court of appeals quoted in its opinion a definition of "public utility" which appeared in Black's Law Dictionary (Rev. 4 Ed. 1968), as being supportive of its conclusion that the words "public utility" include municipal operations. Yet, the primary definition of "public utility," which now appears in Black's Law Dictionary (5 Ed. 1979), at 1108, states: "A *privately owned and operated business* whose services are so essential to the general public as to justify the grant of special *franchises* for the use of public property or of the right of eminent domain, in consideration of which the owners must serve all persons who apply, without discrimination. It is always a virtual monopoly." (Emphasis added.)

Therefore, the majority's result and analysis fail for two reasons. First, as demonstrated above, the language in question pertains solely to private entities. A municipality cannot tax itself or franchise with itself or *regulate* itself. The context in which the language "regulating the rate to be charged for public utility service" appears clearly requires that we confine its application to legislation affecting private interests.

Second, the term "public utility" in common usage is limited to "privately owned and operated" providers. In the context of a sentence dealing with taxation, franchising and regulating, the only sensible meaning to give to the term "public utility" is that which is most commonly accepted and connoting private ownership and operation.

Accordingly, I would reverse the court of appeals.