CITY OF CINCINNATI ex rel. RITTER, Appellee,

v.

CINCINNATI REDS, L.L.C., et al., Appellants; City of Cincinnati.

[Cite as *Cincinnati ex rel. Ritter v. Cincinnati Reds, L.L.C.*, 150 Ohio App.3d 728, 2002-Ohio-7078.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–020038 and C–020039.

Decided Dec. 20, 2002.

Ronald L. Burdge, for appellee.

Keating, Muething & Klekamp, P.L.L., James E. Burke and Matthew K. Buck, for appellant Cincinnati Reds, L.L.C.

Michael K. Allen, Hamilton County Prosecuting Attorney, Christian J. Schaefer and Roger E. Friedmann, Assistant Prosecuting Attorneys, for appellants Hamilton County and Hamilton County Board of Commissioners.

MARK P. PAINTER, Presiding Judge.

{¶ 1}   In keeping with the less than stellar history of stadium construction in Cincinnati is this lawsuit involving the Cincinnati Reds, Cincinnati, and Hamilton County.   It has twisted and turned, parties have been thrown out and substituted, and none of the parties can agree on the rules of the game.   The Reds, Cincinnati, Hamilton County, the taxpayer-plaintiff, and the trial court have become enmeshed in a series of procedural and legal double plays and errors.   It is difficult to determine who, if anyone, is on first.

{¶ 2}   We resolve the case by calling the plaintiff out.

## I.   Ritter's Claims in His Taxpayer Action

{¶ 3}   The original parties in this lawsuit were appellee Steven W. Ritter, a Cincinnati taxpayer, appellant Cincinnati Reds, L.L.C., and defendant city of Cincinnati.   The trial court later joined appellants Hamilton County and its board of commissioners as necessary parties.

{¶ 4}   This case began in March 1996, when Ritter filed a taxpayer action under R.C. 733.59 against Cincinnati, challenging Cincinnati's failure to enforce its lease agreement with the Reds concerning Cinergy Field and seeking collection of rents due.   He subsequently amended his complaint to ensure compliance with R.C. 733.59, the municipal taxpayer statute.   Ritter's initial complaint was filed one day before voters in Hamilton County generously approved a one-half-cent sales-tax increase to finance the construction of a new baseball stadium and a new football stadium.   Six months after Ritter filed his initial complaint, Cincinnati traded Cinergy Field to Hamilton County, and this case went into extra innings.

{¶ 5}   Ritter sought a declaration that the Reds were in breach of their lease with Cincinnati, a termination of the lease, a money judgment for back rent, and damages for the breach.   He also sought to enjoin Cincinnati and the Reds from violating the lease and to enjoin the Reds from pursuing any claims they might have under the lease during the pendency of his action.   Ritter also sought a writ of mandamus directing Cincinnati to enforce the terms of the lease.   The gist of his complaint, as argued by Ritter in one of his motions to the trial court, was "We just want the Reds to pay their rent."   He challenged "the failure of government officials to collect $4.5 million owed to the taxpayers."

## II.   The Various Agreements

## A.   Cincinnati and the Reds

{¶ 6}   Way back in 1967 (so long ago that the World Series was still played in the daytime), Cincinnati signed leases with both the Reds and the Cincinnati

Bengals concerning use of what was then named Riverfront Stadium, later named Cinergy Field, and soon to be blown to smithereens. Under its lease with the Reds, Cincinnati had agreed to treat the Reds as favorably as it treated the Bengals (a clause known legally as "I want what he gets").

{¶ 7} According to the Reds, Cincinnati breached that provision in 1994 when it executed a new lease with the Bengals that was allegedly more favorable than its lease with the Reds. Consequently, the Reds withheld rent payments. The Bengals were, luckily, not part of this lawsuit.

### B. Cincinnati and Hamilton County—Memorandum of Understanding I

{¶ 8} Cincinnati and Hamilton County adopted a Memorandum of Understanding ("MOU I") in 1995. MOU I assigned to Hamilton County, in part, all the interest Cincinnati had in Cinergy Field, the stadium fund, and all leases, including the one with the Reds. Cincinnati agreed not to intentionally interfere with the revenue streams arising from the stadium-use charge, rent payments, or stadium-related revenues in the parking fund. MOU I was amended in April 1996 to insert terms concerning the sales-tax increase for building a new stadium and other construction issues. The assignment became effective in September 1996, six months after Ritter's original lawsuit commenced.

### C. Hamilton County and the Reds—Memorandum of Understanding II

{¶ 9} In 1998, Hamilton County agreed to waive the rent arrearages owed by the Reds in a Memorandum of Understanding regarding the construction, development, use, and operation of a new stadium ("MOU II"). As part of MOU II, the Reds were to contribute $30 million to the construction of the new stadium and to pay an annual base rent of $2.5 million for the first 9 years and $1 annually for years 10 through 30.

{¶ 10} MOU II, in Section 3(B), stated (in legalese, not English) that the existing lease (the 1967 lease) "shall remain in effect until the opening of the Stadium Project. Notwithstanding the foregoing, in the event all conditions precedent to the development of the Stadium Project are satisfied or waived, the parties agree to modify the terms of the existing Lease as set forth in Exhibit B hereto. In the event this agreement is terminated for any reason, including without limitation of the foregoing the failure of either party to satisfy a condition described in Section 7 below or the failure to enter into the Lease, the existing Lease shall remain in effect unmodified by the terms and provisions of this memorandum."

{¶ 11} Exhibit B to MOU II was a document captioned "Modifications to Cinergy Field Lease." In that document, Hamilton County waived all of the existing arrearages owed by the Reds except for 1997 advertising revenues and

the Reds waived their rights to any amounts they might have been entitled to payments made by Cincinnati or Hamilton County to the Cincinnati Bengals (thus settling the "I want what he gets" issue).

### D. Hamilton County and the Reds—1999 Lease

{¶ 12}   In 1999, the Reds and Hamilton County signed a lease.  The monies to be paid by the Reds for rent were identical to those specified in MOU II, and the Reds agreed to pay $30 million in precompletion costs to Hamilton County.  The lease referred to MOU II and the fact that the 1967 lease had been modified. (These were the waiver provisions discussed above.)  The 1999 lease waxed legalese as follows: "The County and the Team agree that such modifications shall remain in effect notwithstanding the execution of this Lease and that the Cinergy Field Lease shall remain in effect (as so modified) until the Completion Date. Notwithstanding the foregoing, (a) in the event this Lease is terminated by either party hereto prior to the Completion Date pursuant to rights granted herein, immediately upon such termination the Cinergy Field Lease shall be deemed not to have been modified as set forth in the memorandum, shall revert to the terms in effect prior to the execution of the memorandum and the parties shall pay any amounts due and payable as a result of such reversion, including sums payable for the period during which such modifications were in effect, as if such modifications had not been in effect, promptly following the termination * * *."

### III.   Labyrinthine Procedural History

{¶ 13}   During the progression of this case, Cincinnati moved to substitute Hamilton County as a defendant because Cincinnati had assigned to Hamilton County all of its rights under the Cinergy Field lease.[1]  Ritter argued against the substitution, contending that his "beef" was with what Cincinnati had done or failed to do, not with any actions by Hamilton County.  He also argued that the doctrine of lis pendens prevented Hamilton County from being a necessary party. Hamilton County also argued against the substitution.

{¶ 14}   Acknowledging that Cincinnati had informed the court and the parties that Hamilton County had been assigned all of Cincinnati's interests in the lease, the trial court sua sponte ordered Hamilton County and the commissioners joined as necessary parties and denied Cincinnati's motion for substitution.  Hamilton County moved for misjoinder, and Cincinnati moved for summary judgment. The trial court denied Hamilton County's motion.  But it granted Cincinnati's summary-judgment motion because Cincinnati had assigned all of its obligations,

---

1.  See Civ.R. 25(C).

liabilities, and responsibilities concerning the lease with the Reds to Hamilton County. It determined, contrary to Ritter's argument, that the doctrine of lis pendens did not preclude Cincinnati from transferring its interest because the doctrine applied to "real property matters" and not to actions for money damages only (actually, lis pendens can apply to personal property also, but that distinction is not relevant here).

{¶ 15} Hamilton County moved for summary judgment, arguing that Ritter's claims were moot because it had renegotiated the lease with the Reds and resolved all outstanding issues, including the back-rent issues and the Reds' claim that Cincinnati had breached the lease.

{¶ 16} Contrary to what it had determined regarding Cincinnati, the trial court ruled that the doctrine of lis pendens was applicable to the case to keep Ritter's action viable. It stated that but for the fact that the taxpayer action had been filed before the assignment and abrogation of the claim, the issue of rent would have been moot. But because it concluded that lis pendens applied to all property interests where an action was pending so as to charge third persons with notice of its pendency, the trial court determined that Hamilton County and the Reds must somehow resolve Ritter's claim on behalf of the public.

{¶ 17} The parties filed trial briefs and stipulations. The trial court determined that the action was for breach of contract and for specific performance of the lease. The court made the factual finding that the 1999 lease between the Reds and Hamilton County was "conditioned upon and [did] not commence until the completion of the new facility and transfer of occupancy." It concluded that the lease was executory in nature and would not become binding until the new stadium was constructed and turned over to the Reds and that the 1967 lease was still in effect, requiring payment of the rent arrearages. The trial court expressed its concern that the Reds and Hamilton County (and previously Cincinnati) had chosen to ignore the taxpayer suit and to enter into a new agreement. The trial court subsequently denied the motions for a new trial or hearing, determined that the Reds owed Hamilton County $6,473,829.39, and, under R.C. 733.61, granted Ritter's request for attorney fees and expenses of $100,029.22.

## IV. The Appeals

{¶ 18} The Reds and Hamilton County have filed separate appeals. The Reds raise the following three assignments of error, claiming that the trial court erred by (1) failing to find that Ritter's lawsuit was moot, (2) entering judgment on a taxpayer suit on behalf of Hamilton County when it lacked jurisdiction to do so, and (3) ruling that Hamilton County was entitled to recover rent under the 1967 lease while ignoring the Reds' countervailing claims.

{¶ 19} Hamilton County claims that the trial court erred by (1) abusing its discretion by awarding Ritter attorney fees when there was no public benefit, (2) sua sponte joining Hamilton County as a party and denying its motion to dismiss under Civ.R. 21, (3) by awarding attorney fees against Hamilton County under R.C. 733.59 et seq., and (4) abusing its discretion in the amount of attorney fees it awarded. We have consolidated the two appeals, preferring a doubleheader to a two-game series.

## A. A Taxpayer's R.C. 733.59 Action

{¶ 20} Ritter brought a taxpayer action against Cincinnati and the Reds to collect past due and current rent. A taxpayer's action is a derivative action, created by statute, that is brought on behalf of the municipality to ensure that its officers comply with the law, do not misapply funds, or do not abuse the municipality's corporate powers.[2] The taxpayer's rights or claims are no greater than the rights or interests of the municipality.[3] A taxpayer action can be brought on behalf of a municipal corporation by a taxpayer after the city's law director refuses, upon written request of the taxpayer, to make any application under R.C. 733.56 through 733.58.[4] Under R.C. 733.56, a city's law director can apply for an injunction "to restrain the misapplication of funds of the municipal corporation, the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the municipal corporation in contravention of the laws or ordinance[s] governing it, or which was procured by fraud or corruption." Under R.C. 733.57, the law director can apply for forfeiture or specific performance of any contract made on behalf of the municipal corporation that is being evaded or violated. Under R.C. 733.58, the law director can apply to a court of law for a writ of mandamus to compel an officer or a board of a municipal corporation to perform any duty "expressly enjoined" by law or ordinance.

{¶ 21} Ritter's action was brought on behalf of Cincinnati, and his "interest in the result to be accomplished [was] the same as that of all of the other taxpayers within the taxing district, or area affected by the misapplication of funds, abuse of corporate powers, or involvement in an illegal contract by the officers acting for the area."[5] Thus Cincinnati was the real party in interest.[6]

---

2. See *Columbus ex rel. Willits v. Cremean* (1971), 27 Ohio App.2d 137, 149, 56 O.O.2d 310, 273 N.E.2d 324.

3. *Vollmer v. Amherst* (1940), 65 Ohio App. 26, 36, 18 O.O. 266, 29 N.E.2d 379.

4. R.C. 733.59.

5. *Columbus ex rel. Willits v. Cremean*, 27 Ohio App.2d at 149, 56 O.O.2d 310, 273 N.E.2d 324.

6. See *Laituri v. Nero* (2000), 138 Ohio App.3d 348, 351, 741 N.E.2d 228.

Ritter's rights as a taxpayer suing on behalf of the municipality could rise no higher than those of Cincinnati, nor could he assert a better claim for Cincinnati than it could assert in its own behalf.[7] To properly bring his action, Ritter was required to comply with R.C. 733.59 by providing a written request that the city law director file suit, and the law director had to refuse to do so. The statute "is intended to prevent the municipal corporation from becoming a plaintiff in court without its consent."[8]

{¶ 22} Ritter complied with the statute. But within a year after he had filed his complaint, the game changed—he was informed that Cincinnati had assigned its interests in the Reds' lease to Hamilton County. "Legally, an assignment is a transfer of property or of some right or interest from one person to another, which causes to vest in another his or her right of property or interest in property. * * * An unqualified assignment transfers to the assignee all the interest of the assignor in and to the thing assigned. * * * As a general rule, an assignee 'stands in the shoes of the assignor * * * and succeeds to all the *rights and remedies* of the latter.' "[9] At that point, Ritter should have filed a taxpayer action against Hamilton County under R.C. 309.13. That would have required Ritter to make a written request that the county prosecutor apply to a trial court to protect public funds under R.C. 309.12. He did not do so.

{¶ 23} Instead, the trial court threw Cincinnati out and joined Hamilton County as a necessary party to the ongoing lawsuit. Although the trial court refused to substitute Hamilton County for Cincinnati, Ritter treated the joinder as a substitution and continued to proceed under R.C. Chapter 733 as evidenced by his request for and the subsequent award of attorney fees under R.C. 733.61. Hamilton County was not a substituted party. It was an additional party brought into the lawsuit by the trial court without any compliance with R.C. 309.13, the county-taxpayer statute. Instead of being substituted for a player taken out of the game, Hamilton County became an extra player on the field. And no one knew what position it was supposed to play.

{¶ 24} At that point, Ritter could no longer compel Cincinnati to collect rent on its behalf without forcing it to breach its agreement with Hamilton County. The transfer forbade Cincinnati to interfere with rent payments. Thus, the practical effect of the trial court's decision was to allow Ritter to proceed with the

---

7.  See *Vollmer v. Amherst,* 65 Ohio App. at 36, 18 O.O. 266, 29 N.E.2d 379.

8.  *State ex rel. Nimon v. Springdale* (1966), 6 Ohio St.2d 1, 5–6, 35 O.O.2d 1, 215 N.E.2d 592.

9.  (Emphasis sic.) *Leber v. Buckeye Union Ins. Co.* (1997), 125 Ohio App.3d 321, 332, 708 N.E.2d 726, quoting *Inter Ins. Exchange v. Wagstaff* (1945), 144 Ohio St. 457, 460, 30 O.O. 44, 59 N.E.2d 373.

case in a representative capacity as a taxpayer of Hamilton County. The trial court converted the municipal-taxpayer action into a county-taxpayer action. There is no support for this procedure—allowing Ritter to maintain a municipal-taxpayer lawsuit against a county.

{¶ 25} The right to bring a taxpayer action is a right conferred by statute. The legislature has clearly defined separate taxpayer actions for a municipality and for a county.

{¶ 26} The trial court did not just allow an improper substitution; it substituted an entire team. But it was not even the same type of team—it was like substituting the Bengals for the Reds, but keeping baseball rules in effect. Understandably, this resulted in confusion.

### B.  Taxpayer's R.C. 309.13 Action

■■ {¶ 27} The Reds in their second assignment argue that the trial court lacked jurisdiction to determine the action against Hamilton County because Ritter had failed to comply with R.C. 309.13 by requesting the county prosecutor to challenge the Reds' failure to pay rent. While the Ohio Supreme Court has characterized the steps in R.C. 309.13 as "jurisdictional and procedural prerequisites for maintaining an R.C. 309.13 taxpayer's action,"[10] there is also support for the proposition that the prerequisites can be waived if the taxpayer alleges in his complaint that "the case was one in which the circumstances otherwise prevented the prosecuting attorney from proceeding with suit pursuant to R.C. 309.12."[11] Further, the Ohio Supreme Court has held in cases involving the municipal-taxpayer statutes that where circumstances show that a written request would be a vain, useless, or futile act, the written request is excused.[12] The futility exception "must be established from events which occur *before* the action is commenced and not reconstructed from hindsight through materials elicited during discovery."[13] We see no reason that the futility exception cannot be applied to a county-taxpayer action.

---

**10.**  *U.S. Corrections Corp. v. Ohio Dept. of Indus. Relations* (1995), 73 Ohio St.3d 210, 217, 652 N.E.2d 766; see, also, *State, Forest Hills School Dist. ex rel. Mullenix v. Forest Hills School Dist. Bd. of Edn.* (Apr. 3, 1985), 1st Dist. No. C–840303, 1985 WL 6730.

**11.**  *State, Forest Hills School Dist. ex rel. Mullenix v. Forest Hills School Dist. Bd. of Edn.*, supra.

**12.**  *State ex rel. Nimon v. Springdale*, supra;  *State ex rel. White v. Cleveland* (1973), 34 Ohio St.2d 37, 63 O.O.2d 79, 295 N.E.2d 665.

**13.**  *Jenkins v. Eberhart* (1991), 71 Ohio App.3d 351, 357, 594 N.E.2d 29.

{¶ 28}   In this case, the trial court dragged Hamilton County into the lawsuit after it argued against being substituted for Cincinnati.   Further, the trial court acknowledged its frustration at Hamilton County for not stepping up to the plate to protect its interests.   Under the particular facts of this case, we conclude that the circumstances indicated that the R.C. 309.13 prerequisites would have been futile.   Therefore, the trial court had jurisdiction over Hamilton County, in spite of Ritter's noncompliance.   We overrule the Reds' second assignment.   But we find merit in the Reds' first assignment.

## C.  Lis Pendens

{¶ 29}   The trial court was under the impression that the filing of a taxpayer action precluded Hamilton County from settling or compromising its claims with the Reds. Part of this conclusion was based on the application of the doctrine of lis pendens.

{¶ 30}   Lis pendens is a legal doctrine—literally "a pending lawsuit."   It means that the filing of a lawsuit concerning specific property gives notice to others of the claim alleged in the lawsuit and that a purchaser of the property may take the property subject to the outcome of the lawsuit.

{¶ 31}   Lis pendens is not a substantive right.   It does not create a lien, but "charges the purchaser with notice of the pending action."[14]   If applicable, it *does not prevent* persons from transacting an interest in the property subject to litigation.[15]   Any conveyed interest, however, becomes subject to the outcome of the pending litigation.   The purpose of lis pendens is to protect the plaintiff's interest in the subject property.[16]   Under the doctrine, "no interest can be acquired by third persons in the subject of the action, as against the plaintiff's title."[17]

{¶ 32}   As this court explained in *Bradford v. Reid*,[18] " Lis pendens requires the following: (1) the property be of a character subject to the rule; (2)

---

14.   *Levin v. George Fraam & Sons, Inc.* (1990), 65 Ohio App.3d 841, 847, 585 N.E.2d 527, quoting *Carmichael Tile Co. v. Yaarab Temple Bldg. Co.* (1933), 177 Ga. 318, 328, 170 S.E. 294.

15.   *Wheeling Corp. v. Columbus & Ohio River RR. Co.*, 147 Ohio App.3d 460, 2001-Ohio-8751, 771 N.E.2d 263, ¶ 119.

16.   *Bradford v. Reid* (1998), 126 Ohio App.3d 448, 452, 710 N.E.2d 761, citing *Martin, Rochford & Durr v. Lawyer's Title Ins. Corp.* (1993), 86 Ohio App.3d 20, 22, 619 N.E.2d 1130.

17.   R.C. 2703.26.

18.   *Bradford v. Reid*, 126 Ohio App.3d at 452, 710 N.E.2d 761.

the court have jurisdiction over both the person and the res; (3) the property be sufficiently described in the pleadings; and (4) the property be directly affected by the judgment in the pending suit." To be directly affected, the property must be "at the very essence of the controversy between the litigants."[19]

{¶ 33} In its April 26, 1999 decision, the trial court held that lis pendens did not prevent Cincinnati from assigning its interest in Cinergy Field to Hamilton County, and it characterized Ritter's lawsuit as an action for money damages that did not directly affect any title interest in real property. The trial court was correct—lis pendens did not apply to this case at all. Then, because Cincinnati no longer had any interest in rent payments, the trial court granted Cincinnati's summary-judgment motion. Cincinnati was out of the game.

{¶ 34} But then the trial court made a double error when it reversed itself and held that its prior determination was erroneous. It ruled that lis pendens actually applied from the filing of the original lawsuit. But the trial court was right the first time—lis pendens did not apply to the facts of this case.

{¶ 35} Normally, lis pendens involves (1) a plaintiff with title to the subject property, (2) a defendant who has some dispute about the property with the plaintiff, and (3) a third party who is not a party but somehow acquires an interest in the subject property while the lawsuit is pending.

{¶ 36} Ritter's "interest" as a taxpayer-plaintiff was not a property interest per se. His interest was in the protection of public funds. Thus the first requirement of lis pendens was not met. Hamilton County, as a result of its joinder and the dismissal of Cincinnati, was not a third party acquiring an interest in any property against Ritter's title. What was at issue was the collection of a debt. Recovery of a money judgment against the Reds for rent collection did not directly affect the property at issue. Though any of these impediments would have been fatal to lis pendens, it succumbed to all three. Lis pendens was not just out; it was never in the game. Ritter's claim was abrogated by the settlement between Hamilton County and the Reds.

### D. The Taxpayer Suit Did Not Preclude Compromise

{¶ 37} The trial court mistakenly assumed that a taxpayer suit precludes a municipality or county from resolving the underlying claim. First, "[i]t is elementary that the mere fact that a municipal corporation may sue and be sued confers upon it also the power to compromise and settle both threatened and pending suits."[20] It has "the power to settle and compromise, prior to

---

**19.** Id., quoting *Katz v. Banning* (1992), 84 Ohio App.3d 543, 548, 617 N.E.2d 729, quoting *Levin v. George Fraam & Sons*, 65 Ohio App.3d at 846, 585 N.E.2d 527.

**20.** *Columbus Gas & Fuel Co. v. Columbus* (S.D.Ohio 1941), 42 F.Supp. 762, 769.

litigation, a disputed claim that arises out of subject matter concerning which the municipality has the general power to contract, if at the time of settlement there was a bona fide reasonable doubt or dispute as to the validity of the claim."[21] Further, "the contracts of a municipal corporation, unless limited by positive provisions of statute law, are governed by the same principles as apply to contracts between individuals. As between the latter, parties competent to contract are competent to modify or to abrogate the contracts, so far as executory, between them made; the consideration therefor being found in the mutual waivers of rights thereunder."[22]

{¶ 38} Unless expressly prohibited by statute, a county has the same "power to adjust, arbitrate and settle disputed claims" as does an individual.[23] Hamilton County can release a debt, judgment, fine, or amercement due the county except where any of its commissioners are personally interested.[24] It may lease a sports facility.[25] A settlement of conflicting claims between the Reds and Hamilton County is clearly within the scope of Hamilton County's statutory authority.[26] And there is no legal basis to hold that a county cannot settle a claim without input by a taxpayer who has filed a lawsuit, or that a trial court must consider the fairness or reasonableness of such a settlement or compromise.[27]

{¶ 39} We find enlightening the Minnesota Supreme Court's comments in *Oakman v. Eveleth.*[28] That case involved a proposed ordinance providing for settlement of claims against former city officials and their sureties. A taxpayer instituted a suit against the former officials to collect money for the city. The city did not act. Instead, it settled the pending litigation. On appeal, the taxpayer questioned the right of the city to step in and settle the matters involved in his lawsuit. The court explained, "We think, however, that where a city in good faith desires to compromise and settle pending litigation, and may do

**21.** 56 American Jurisprudence 2d (2d Ed.2000), Municipal Corporations, Counties, and Other Political Subdivisions, Section 758.

**22.** *Phelps v. Logan Natural Gas & Fuel Co.* (1920), 101 Ohio St. 144, 148, 128 N.E. 58.

**23.** *Quinby v. Cleveland* (N.D.Ohio 1911), 191 F. 68, 77. See *Springfield v. Walker* (1885), 42 Ohio St. 543, 1885 WL 49.

**24.** R.C. 305.26.

**25.** R.C. 307.023.

**26.** Accord *State ex rel. Jewett v. Sayre* (1914), 91 Ohio St. 85, 97, 109 N.E. 636.

**27.** *Laituri v. Nero* (2000), 138 Ohio App.3d 348, 741 N.E.2d 228.

**28.** *Oakman v. Eveleth* (1925), 163 Minn. 100, 203 N.W. 514.

so, the paramount public welfare demands that such settlement may not be hindered or thwarted by a single taxpayer, even though he be courageous in the cause of public justice. The responsibility for action or nonaction in such matter must rest upon the public officials."[29] Thus, a county has discretion to evaluate a case and to determine what sort of settlement is in the best interests of its citizens.[30] "[I]n the absence of fraud or collusion, courts have no authority to substitute their opinion and discretion for the opinion and discretion of a board clothed with authority by law to determine the question in controversy."[31]

{¶ 40} Similarly, a taxpayer's suit cannot be "used to control or interfere with the discretion of a municipal board," absent fraud or a gross abuse of discretion.[32] To allow a taxpayer suit in this case to abrogate a contract against the wishes of the contracting parties could have worked irreparable harm—in this case, e.g., further lawsuits for breach of contract or delayed construction with respect to the new stadium. In this case, the collection of rent was not necessarily the sole criterion to consider in evaluating the welfare of the citizens of Hamilton County. The Reds had withheld rent payments on the ground that Cincinnati had breached its lease. Cincinnati claimed that the Reds had breached. Cincinnati failed to give notice of the default. Hamilton County accepted the assignment of the lease under those conditions. It decided to compromise the legal dispute by modifying the 1967 lease.

{¶ 41} According to the Ohio Supreme Court, "Where there is a debt due the county that the board of county commissioners, under authority conferred by Section 2416, General Code [the predecessor of R.C. 305.26], may compound or release in whole or in part, and the debtor in good faith is making a claim against the county that the board of county commissioners has the right and authority to allow or reject, in whole or in part, a contract made and entered into by the board of commissioners with the debtor, by which the debtor is released from the payment of all or part of the debt due the county, in consideration of his releasing the county from liability for all or part of his claim against the county, is binding upon the county and the debtor alike, and neither can be released from the terms of such contract of settlement without the consent of the other contracting party."[33]

---

29. Id. at 102, 203 N.W. 514.

30. Accord *Laituri v. Nero*, 138 Ohio App.2d at 351, 741 N.E.2d 228.

31. *State ex rel. Jewett v. Sayre*, 91 Ohio St. at 95, 109 N.E. 636.

32. 18 McQuillin, Municipal Corporations (3d Ed.1993), Section 52.21, 46.

33. *State ex rel. Jewett v. Sayre*, 91 Ohio St. at 86, 109 N.E. 636, syllabus.

{¶ 42} The trial court recognized that if lis pendens could not be applied, nothing prevented Hamilton County and the Reds from compromising their claims. According to the stipulated record, there were allegations that both Cincinnati and the Reds breached their contract. Ritter made no claim that the lease was illegal or that fraud was involved. The issue was thus whether it would have been advisable from the standpoint of Hamilton County to prosecute a breach-of-contract action against the Reds and what benefits would have resulted from doing so. Hamilton County chose not to sue, a decision that was within its discretion to make.

### E. An Executory Accord

{¶ 43} In their next argument, the Reds contend that the trial court erred by concluding that the Reds' settlement agreement with Hamilton County was an "executory contract" that was not binding until the new stadium was completed. This is like saying "it ain't over till it's over." But the Reds are correct—it is over. The agreement was an executory contract—and executory contracts are binding.

{¶ 44} The April 30, 1999 lease between Hamilton County and the Reds clearly stated that the lease term would commence on the date the lease was fully executed (the contract was signed June 16, 1999) and to terminate on October 31 of the 30th lease year. The lease contained a modification to the 1967 Cinergy Field Lease and recognized that the lease and modifications were effective until the new stadium was completed. The modification included the waiver of claims by the Reds and Hamilton County against each other. The lease stated that if the new lease were terminated, the old lease would remain in effect without the modifications.

{¶ 45} "An 'accord executory' or an executory accord is an agreement for the future discharge of an existing claim by a substituted performance. The agreement, i.e., the accord, itself is not at once operative as a discharge of the claim in that the agreement itself does not so provide; if it does so provide, it operates accordingly and is a substituted contract rather than an executory accord. * * * [A]lthough the executory accord does not immediately discharge the original duty, until performance of the accord, the original duty is suspended unless there is such a breach of the accord by the obligor as discharges the new duty of the obligee to accept the performance in satisfaction."[34] An executory accord is a type of bilateral contract, and "[a]s long as the basic requirements to form a contract are present, there is no reason to treat such a settlement

---

34. *Barnhouse v. Rollins Acceptance Corp.* (Dec. 16, 1987), 4th Dist. No. 393, 1987 WL 28439. (Citations omitted.)

agreement differently than other contracts which are binding. This is consistent with the public policy dictating that courts should 'look with favor upon the compromise or settlement of law suits in the interest of efficient and economical administration of justice and the lessening of friction and acrimony.' "[35]

{¶ 46} The trial court was correct that the Reds and Hamilton County entered into an executory accord. But it was incorrect in determining that the contract would "not become binding on the parties" until later. There was an enforceable contract—the fact that some parts of it were yet to be performed did not make it unenforceable. In fact, most contracts are for something in the future. A contract is a promise—and a promise necessarily implicates future conduct.

{¶ 47} Under the contract, the Reds' and Hamilton County's disputed obligations under its original lease were suspended unless either party terminated the 1999 lease prior to completion of the new stadium. Unless and until the Reds were to breach the new lease according to its terms, Hamilton County could not maintain an action for collection of past-due rent under the 1967 lease. There was no claim.

### F. Ritter's Claim Was Moot

{¶ 48} Because Ritter's taxpayer lawsuit did not preclude Hamilton County from settling any claims against the Reds for past-due rent, we conclude that the trial court erred by ordering the Reds to pay rent and arrearages due under the 1967 lease. Thus, because Hamilton County and the Reds properly agreed to waive their disputed claims against each other under the former lease unless and until the new lease was breached, Ritter's claim was moot. We sustain the Reds' first assignment. As to the Reds' third assignment, it is subsumed in our disposition of its first assignment.

### G. Attorney Fees

{¶ 49} Three of four of Hamilton County's assignments challenge the attorney fees and expenses awarded to Ritter. The trial court awarded Ritter fees and expenses under R.C. 733.61. This was error because the trial court's procedural decision resulted in the county taxpayer statute, not the municipal-taxpayer statute, being applicable to this case. There is nothing in the municipal-taxpayer statute that gives a trial court the power to force a county to pay attorney fees. (And even if R.C. 733.61 had been applicable, we question whether there was any public benefit.)

---

35. *Clark v. Elza* (1979), 286 Md. 208, 219, 406 A.2d 922. See *Barnhouse v. Rollins Acceptance Corp.*, supra.

{¶ 50} Under the county-taxpayer statute,[36] a trial court has discretion to allow costs, including reasonable compensation for a taxpayer's attorney, if the court is satisfied that the taxpayer is entitled to the relief he has sought, and if a judgment is entered in his favor. We conclude that Ritter's demand for attorney fees and expenses should have been denied. Our decision that Ritter was not entitled to the relief he sought has supplanted the trial court's decision, making void the award of attorney fees.[37] That is, if you do not win the game, you do not get the prize. Our determination that the trial court wrongly granted attorney fees sustains Hamilton County's first assignment and subsumes its third and fourth assignments. Similarly, our conclusions that the assignment of the lease to Hamilton County precluded Cincinnati from collecting rent and that Hamilton County was the entity that had the authority to settle any claims with the Reds after the assignment subsume Hamilton County's second assignment contesting its joinder in the underlying action.

## V. Conclusion

{¶ 51} Accordingly, we reverse the trial court's judgment in favor of Ritter (out one). We enter judgment for the Reds (out two), and for Hamilton County (out three). The city of Cincinnati was thrown out in an earlier inning, so this case is over.

Judgment accordingly.

GORMAN and SUNDERMANN, JJ., concur in judgment only.

---

**36.** R.C. 309.13.

**37.** See *Bird v. Erie Cty. Bd. of Commrs.* (1984), 6th Dist. No. E–83–28, 1984 WL 6594; *Arnold v. State ex rel. Carson* (1930), 39 Ohio App. 479, 177 N.E. 917; *State ex rel. Hile v. Zangerle* (1929), 34 Ohio App. 335, 171 N.E. 319.