OPINION
{¶ 1} Plaintiff-appellant, City of Mentor, ex relator Donald A. Deitrick, on his own behalf and on the relation of the taxpayers and citizens of Mentor, Ohio, appeals the decision of the Lake County Court of Common Pleas, granting summary judgment in favor of defendant-appellee, the City of Mentor, on Deitrick's claims for declaratory *Page 2 
judgment and injunctive relief. For the following reasons, we affirm the decision of the court below.
 {¶ 2} The subject matter of the present case is a 54 acre parcel of land located in Mentor, Ohio, off Heisley Road, and adjacent to the City of Painesville. The property, owned by Jiggy, Ltd., was zoned M-1 Light Manufacturing. Jiggy entered into an agreement to sell the property to United Commercial of Mentor, LLC, which sought to develop the property for retail use. To this end, Jiggy and United Commercial sought to have the property rezoned B-2 General Business District.
 {¶ 3} The Charter of Mentor, Section 3.09(A)(4), requires that "[legislation providing for a zoning change of lands from any industrial district zoning classification to a commercial district zoning classification" must be "approved by a majority of the electors of the City of Mentor."
 {¶ 4} In the spring of 2005, Jiggy and United Commercial circulated an initiative petition to have the proposed rezoning of the parcel placed on the November ballot as "Issue 8." Issue 8 was defeated in the November election.
 {¶ 5} On February 15, 2006, Jiggy and United Commercial sued the City of Mentor seeking a declaration that the M-1 classification was unconstitutional and that they were entitled to develop the property for retail use in accordance with Mentor's B-2 zoning classification.
 {¶ 6} Mentor officials met with representatives of Jiggy and United Commercial and reached a settlement agreement, providing for the development of a "retail store" on the property. The development agreement provides for the division of the property into two parcels, the construction of access roads and other improvements, the *Page 3 
financing of such improvements, a commitment from United Commercial/Jiggy to reimburse Mentor for legal costs if the agreement is challenged in court, a limitation on the total number of square feet of building improvements, and a requirement that sixty percent of all construction workers employed be from Northeast Ohio. The development agreement contained a further provision that, if United Commercial has not commenced development of "the intended retail store" within twenty-four months of all permits and governmental approvals having been obtained, Mentor "shall have the right, but not the obligation, to demand United Commercial and Jiggy to petition the Lake County Court of Common Pleas to vacate any final judgment entry and mark this matter as voluntarily dismissed without prejudice upon the journal of such Court."
 {¶ 7} On May 2, 2006, the Mentor City Council passed Ordinance No. 06-O-51 as an Emergency Ordinance authorizing the City Manager and Law Director "to approve the resolution of the lawsuit." According to its terms, "[t]his Ordinance is declared to be an emergency measure necessary for the preservation of the public peace, health, welfare and safety of the inhabitants of this City and for the further reason that this Ordinance is required to be immediately effective to enable the City to move forward with resolution of said lawsuit."[1]
 {¶ 8} On May 3, United Commercial/Jiggy moved for summary judgment.
 {¶ 9} On the same day, the following Stipulation of Facts was jointly filed by Mentor and United Commercial/Jiggy. *Page 4 
 {¶ 10} "3. Plaintiff United Commercial of Mentor * ** intends to develop the Property for retail usage. The development will be anchored by a large national retailer (`National Retailer') who intends to construct a new `big box' facility in excess of 200,000 square feet."
 {¶ 11} * *
 {¶ 12} "4. The Property is bounded by retail users on the north, on the east by a City of Painesville commercial district, and on the south and west by vacant land and industrial users."
 {¶ 13} * *
 {¶ 14} "6. The Property's isolated location at the municipal corporation limit, and its relationship to existing commercial users, when combined with the economic climate of northeastern Ohio and the lack of growth in the industrial sector, render development of the Property under the current zoning of the property as M-1 Light Manufacturing, economically infeasible. The development limitations of the current zoning classification excessively and unreasonably limit the potential for rational use and development of the Property."
 {¶ 15} "7. The adjacent zoning to the north of the Property, B-2, General Business District, which permits a wide variety of commercial retail and service uses and is the City's most intensive commercial zoning classification, currently includes a Sam's Club, Home Depot, Gander Mountain and Atlas Cinemas."
 {¶ 16} "8. The commercial use of the Property and the anchoring by the National Retailer would be compatible with the established land use patterns in the immediate *Page 5 
vicinity and would complement the large national retailers identified above and currently operating immediately to the north of the Property."
 {¶ 17} * *
 {¶ 18} "10. There is intense competition for anchors such as the National Retailer and for the subject National Retailer in particular. The unique location of the Property immediately adjacent to the City of Painesville's border (with its accompanying commercial district), coupled with the intense competition for the National Retailer, puts the City in a position of defenselessness if it is not permitted to accommodate the development of the Property as contemplated by United Commercial."
 {¶ 19} "11. The City's economic and tax base is heavily dependent on the retail sector."
 {¶ 20} "12. If the National Retailer is not permitted to locate on the Property, such prohibition would deprive the City and the Mentor School District of millions of dollars of much needed income and real property taxes in addition to millions of dollars that would be funded by private sources to construct new roads, traffic signalization and other infrastructure improvements necessary to accommodate th[e] added burdens that would come along with those benefits."
 {¶ 21} "13. The City will be uniquely and irreparably harmed if the National Retailer is not permitted to locate on the Property since its first and closest alternative would be to locate across the municipal boundary line in the City of Painesville. Location of the National Retailer in Painesville would involuntarily cast the City into a position of receiving none of the benefits of the proposed development and, at the same time, being involuntarily forced to absorb the related burdens, burdens that would be *Page 6 
absorbed with existing roads and infrastructure that do not have the capacity to accommodate those added burdens and no source of funding to make the necessary remedial changes."
 {¶ 22} "14. The City's fears are of losing the National Retailer and being burdened by the outfall of that loss are warranted. The owner of the commercial parcel located in the City of Painesville immediately adjacent to the Property spent $23,239.15 trying to defeat the proposed development of United Commercial [Issue 8]."
 {¶ 23} "15. The City will be irreparably and permanently harmed if United Commercial's proposed development is not permitted."
 {¶ 24} On May 5, 2006, the Lake County Court of Common Pleas granted summary judgment in favor of United Commercial/Jiggy. The judgment entry stated: "the plaintiffs * * * are entitled to use and maintain the property for the uses now permitted and for the uses which may hereafter be permitted in the B-2, General Business District and that the city * * * shall issue all approvals and permits for the development and maintenance of the property for uses permitted in the B-2 General Business District subject however to conformity with the Development Agreement entered into by the parties * * * which is hereby incorporated by reference."
 {¶ 25} At the time the United Commercial/Jiggy lawsuit was being resolved, it was understood by the parties that Wal-Mart was the intended "National Retailer" referenced in the development agreement and stipulation of facts.
 {¶ 26} On May 17, 2006, Mark P. Escaja of United Commercial and Jerome T. Osborne, III, of Jiggy, wrote to Richard A. Hennig, Law Director for the City of Mentor. The letter stated: "Please accept this letter as confirmation that the intended retail user *Page 7 
* * * is Walmart. You are hereby further advised that both Plaintiffs agree that should Walmart not announce its intentions to locate a new retail store * * * within ninety (90) days of dismissal of the above-captioned case, or Walmart later renounces its intention * * *, then the reversion paragraph * * * in the Development Agreement shall be invoked, the Court will be requested by the Plaintiffs to vacate the summary judgment entry and the Plaintiffs will cause a voluntary dismissal without prejudice to be filed regarding both counts of the Complaint, or, if that cannot be done because the Court does not act, then, they shall only use the property for M-1 purposes with any approved conditional uses."
 {¶ 27} Although Wal-Mart failed to announce the location of a new retail store on the subject property, the deadline for such announcement has been repeatedly extended.
 {¶ 28} On June 20, 2006, Deitrick filed a taxpayer suit against Mentor. Deitrick alleged the suit filed by United Commercial/Jiggy against Mentor was a "collusive" action for the purpose of avoiding the provisions of the City Charter and the defeat of the Issue 8 initiative petition. Deitrick further alleged that Ordinance 06-O-51, authorizing the settlement of the lawsuit was not a true "emergency," but merely a device "to prevent the citizens of Mentor from exercising their rights of referendum on the rezoning issue." Thus, Deitrick maintained the settlement of the lawsuit was not in good faith. Deitrick sought a declaration that Ordinance No. 06-O-51 was unenforceable and an order requiring the City not to rezone the property unless such rezoning were approved by the voters.
 {¶ 29} Following discovery, the City of Mentor moved for summary judgment. *Page 8 
 {¶ 30} On April 16, 2007, the trial court granted summary judgment in Mentor's favor. The court held the emergency clause of Ordinance No. 06-O-51 sufficiently stated and defined circumstances justifying its passage as an emergency. Thus, the lower court held the propriety of the Ordinance as an emergency was not subject to judicial review. As to the settlement of the United Commercial/Jiggy lawsuit, the court held that the "Plaintiffs fail[ed] to demonstrate that the settlement * * * involved fraud, duress, bad faith, or any other misconduct by Mentor officials." Thus, the City acted within its discretion by enacting legislation for the purpose of settling the lawsuit.
 {¶ 31} Deitrick duly appeals and raises the following assignments of error:
 {¶ 32} "[1.] The trial court erred in granting the City's Motion for Summary Judgment because the trial court failed to find that there was no genuine issue of material fact, as required by Ohio R. Civ. P. 56.
 {¶ 33} "[2.] The trial court erred in granting the City's Motion for Summary Judgment because there were multiple disputed issues of material fact, and the trial court improperly made credibility determinations in favor of the moving party without benefit of a trial."
 {¶ 34} Pursuant to Civil Rule 56(C), summary judgment is proper when (1) the evidence shows "that there is no genuine issue as to any material fact" to be litigated, (2) "[t]he moving party is entitled to judgment as a matter of law," and (3) "it appears from the evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence * * * construed most strongly in the party's favor." A trial court's decision to grant summary judgment is reviewed by an *Page 9 
appellate court under a de novo standard of review. Grafton v. OhioEdison Co., 77 Ohio St.3d 102, 105, 1996-Ohio-336. A de novo review requires the appellate court to conduct an independent review of the evidence before the trial court without deference to the trial court's decision. Brown v. Cty. Commrs. of Scioto Cty. (1993),87 Ohio App.3d 704, 711 (citation omitted).
 {¶ 35} Deitrick's assignments of error both challenge the grant of summary judgment and will be considered together.
 {¶ 36} Deitrick is authorized to "institute suit in his own name, on behalf of the municipal corporation [of which he is a taxpayer]," in "a court of competent jurisdiction for an order of injunction to restrain * * * the abuse of its corporate powers, or the execution or performance of any contract made in behalf of the municipal corporation in contravention of the law or ordinance[s] governing it, or which was procured by fraud or corruption." R.C. 733.59 and 733.56.
 {¶ 37} The Ohio Supreme Court has recognized that municipalities have the discretion to enter into settlement agreements to resolve litigation. State ex rel. Obojski v. Perciak, 113 Ohio St.3d 486,2007-Ohio-2453, at ¶ 19, citing Laituri v. Nero (2000),138 Ohio App.3d 348, 351 ("the city has the discretion to evaluate a case and determine that a settlement * * * is in the best interest of its citizens"), andWalther v. Walther (1995), 102 Ohio App.3d 378, 383 ("[i]n the absence of fraud, duress, overreaching or undue influence, or of a factual dispute over the existence of terms in the agreement, the court may adopt the settlement as its judgment"). *Page 10 
 {¶ 38} Deitrick argues that, construing the evidence most strongly in his favor, three genuine issues of material fact exist as to whether the City of Mentor's settlement of the United Commercial/Jiggy lawsuit was in good faith.
 {¶ 39} The first issue is whether the City evaluated the merits of the United Commercial/Jiggy lawsuit before deciding to settle it. Deitrick's position is that evidence indicating the City did not evaluate the merits raises a genuine issue of material fact whether the lawsuit was settled in good faith.
 {¶ 40} Deitrick relies on deposition testimony from representatives of United Commercial/Jiggy and Ronald M. Traub, Mentor's Community Development Director, that they did not discuss the merits of the lawsuit before engaging in settlement negotiations. Council President Raymond Kirchner testified he concluded the lawsuit should be settled "when I saw the possibilities of what could go in there and how the City would be able to control its own destiny, if you will, from a traffic standpoint given the potential for gridlock on Heisley Road." Finally, Deitrick relies on the affidavit of his own counsel, Mark L. Wallach, that Mentor's Law Director, Hennig, remarked in a discussion held in the lower court's chambers in the course of the United Commercial/Jiggy lawsuit that Mentor would have fought the lawsuit were it not for the chance of having a Super Wal-Mart located on the property.
 {¶ 41} Contrary to Deitrick's position, this evidence does not raise a genuine issue of material fact regarding Mentor's good faith in settling the United Commercial/Jiggy lawsuit. It is important to recognize that the members of Mentor's City Council were not attorneys and deferred to the judgment of the Law Director regarding the merits of the lawsuit. *Page 11 
 {¶ 42} Mentor's Law Director, Hennig, testified that he did evaluate the merits of the case. By affidavit, Hennig testified that, upon receipt of the complaint, "I reviewed the Complaint, researched and reviewed relevant zoning case law, determined that the Complaint had merit and would be expensive for the City to defend, and further determined that it would be in the City's best interest to explore whether the matter could be settled quickly to the advantage of the City rather than expensively litigate the matter for months and months, only to settle anyway."
 {¶ 43} Hennig further elaborated on the merits of the lawsuit in his deposition: "Whether or not it was ultimately going to be successful — well, I didn't even know at that time who the judge would be, but they wanted commercial use of property that was right across from a Sam's Club and right next to a Gander Mountain and kitty-corner to the Home Depot and next to the LaMa(lf)a Hotel and the Atlas Cinema and the Damon's Restaurant and the gas station, the BP, and the Burger King and McDonald's and a few other commercial occupants, I think BW3. They're all there, you know. So to say the concept of putting another commercial establishment within walking distance of all of those other commercial establishments * * * didn't seem too far fetched for me."
 {¶ 44} Mentor City Manager, John William Konrad, testified by deposition that he discussed the merits of the suit with Hennig and believed the suit had "a good chance of being successful." Likewise, Robert Ranallo, counsel for United Commercial/Jiggy, deposed that he discussed the merits of the suit with Hennig.
 {¶ 45} Recognizing the United Commercial/Jiggy lawsuit had potential merit, Mentor officials were motivated by a variety of considerations to settle. Council President Kirchner and Councilman Robert Michael Shiner both felt it was better to *Page 12 
settle the lawsuit on the City's own terms rather than "take a chance" in court. It was noted that the economic climate in the area did not favor manufacturing and that by settling the City could obtain infrastructure improvements, i.e. roads, at the expense of the developers. Konrad and Hennig also mentioned the need to minimize legal expenses since Mentor was involved in several costly lawsuits. Finally, city officials felt it would be more beneficial for the development of a "big box" retailer to occur in Mentor, rather than on an adjacent parcel in the City of Painesville.
 {¶ 46} Deitrick also argues that Mentor officials played no part in drafting the Stipulation of Facts which served as the basis for settling the United Commercial/Jiggy lawsuit and, thus, demonstrates the officials did not act in good faith. The record, however, does not support Deitrick's contention that "the City provided absolutely no input into its drafting." Ranallo, counsel for United Commercial/Jiggy, testified that he created the initial draft of the stipulations and was aided by Mentor Law Director Hennig and a retained land use expert, David Hartt. Mentor Community Development Director Traub testified that he was "very involved" in the creation of the stipulations, primarily by providing Ranallo with information. There is no contradictory evidence that Mentor officials Hennig and Traub were not involved in preparing the stipulations used to settle the United Commercial/Jiggy lawsuit.
 {¶ 47} The third purported issue of material fact concerns the reversionary rights paragraph in the development agreement and extended in the subsequent correspondence between Mentor and United Commercial/Jiggy. Deitrick maintains "the fact that the City required that Wal-Mart be part of the development showed that the City did not actually believe that the United Commercial case had any merit, but agreed to *Page 13 
settle the case solely to obtain a Super Wal-Mart" and/or "to avoid the City Charter provision."
 {¶ 48} City Manager Konrad and Attorney Ranallo testified that both Mentor and United Commercial/Jiggy favored the inclusion of a reversionary rights provision in the development agreement. Under this provision, Mentor could seek to have the judgment entry settling the lawsuit vacated if United Commercial/Jiggy had not commenced development within two years of obtaining the necessary permits and approvals. Law Director Hennig testified it was his idea to have a more specific provision, requiring the announcement of the opening of a Wal-Mart within ninety days, included in the May 17, 2006 letter from United Commercial/Jiggy.
 {¶ 49} These provisions do not evidence bad faith by Hennig or Mentor city officials. Both provisions redound to Mentor's benefit, by allowing the current zoning to remain in effect should United Commercial/Jiggy fail to secure the intended development. It would be prudent to include such provisions in any development agreement regarding the property, irrespective of whether the lawsuit challenging the constitutionality of the zoning has merit. Since this is so, the existence of these provisions do not support the inference that Mentor only settled the lawsuit in order to obtain a Wal-Mart.
 {¶ 50} Construing all the evidence most strongly in Deitrick's favor, reasonable minds could not conclude that Mentor officials acted in bad faith by settling the United Commercial/Jiggy lawsuit. Deitrick makes two basic claims of bad faith. The first is that Mentor officials entered into the settlement with United Commercial/Jiggy in order to circumvent the Mentor City Charter requiring zoning changes to be approved by a *Page 14 
majority of the electors. United Commercial/Jiggy initially sought to effect a change in the zoning directly by initiative petition. There is no evidence that anyone in Mentor municipal government had an interest in or took part in trying to influence the outcome of the referendum vote on United Commercial/Jiggy's petition. Likewise, there is no evidence that anyone in Mentor municipal government "colluded" with representatives of United Commercial/Jiggy prior to the filing of the lawsuit. It was not until the suit was actually filed that Mentor officials began negotiations with United Commercial/Jiggy. There is no evidence Mentor officials were trying to circumvent the 2005 defeat of the initiative petition. United Commercial/Jiggy may have filed suit to circumvent that defeat, but Mentor officials did not encourage the filing of the suit and were indifferent to the prospects of such a suit until United Commercial/Jiggy had announced its intention to sue.
 {¶ 51} The second claim is that Mentor officials settled the suit without making any substantive analysis of its merits, and were solely motivated by the prospects of obtaining a Wal-Mart. This claim, too, lacks an evidentiary foundation. Hennig testified that he did analyze the merits of the suit and concluded that it had potential merit. Mentor officials deferred to Hennig's estimation that the lawsuit had some chance of being successful. That fact that Hennig and the city officials were not absolutely convinced of the lawsuit's merit does not equate to bad faith. As long as the lawsuit was something more than patently frivolous, Mentor officials were entitled to consider other factors, such as the costs of litigation or benefits to Mentor's economy and infrastructure, in deciding whether to actively oppose the lawsuit. Municipal governments have "the power to settle and compromise, prior to litigation, a disputed *Page 15 
claim that arises out of subject matter concerning which the municipality has the general power to contract, if at the time of settlement there was a bona fide reasonable doubt or dispute as to the validity of the claim." Cincinnati ex rel. Ritter v. Cincinnati Reds,LLC, 150 Ohio App.3d 728, 2002-Ohio-7078, at ¶ 37, citing 56 American Jurisprudence 2d (2 Ed. 2000), Municipal Corporations, Counties, and Other Political Subdivisions, Section 758; Laituri,138 Ohio App.3d at 351 (where a municipal corporation settled a $7 million claim for $525,000, this court held "the city has the discretion to evaluate a case and determine that a settlement, at some amount less than the full alleged value, is in the best interest of its citizens").
 {¶ 52} In the present case, Mentor officials opted to seek a ready settlement of the suit rather than to expend resources, i.e. time and money, to oppose it. The accuracy of Hennig's evaluation, the wisdom of the officials' decision to settle, and the ultimate constitutionality of the zoning are not determinative of Mentor officials' bad faith in making this decision.
 {¶ 53} The terms on which Mentor resolved the suit also have a very limited bearing on whether the decision to settle was made in bad faith. It is common practice to resolve litigation without admitting liability or otherwise acknowledging the merits of the suit. In the present case, Mentor officials prudently sought a way of maintaining the M-1 Light Manufacturing zoning classification in the event that United Commercial/Jiggy were unable to fulfill their part of the development agreement. This is not evidence of bad faith, as Deitrick suggests. Rather, it reflects what we have recognized above, that municipal officials do not need to be absolutely convinced of a suit's merits before deciding to the settle the suit. *Page 16 
 {¶ 54} In sum, Deitrick's conception of bad faith is excessively broad. According to Deitrick, Mentor officials should have vigorously opposed the United Commercial/Jiggy lawsuit if there were any chance of defeating it. Such a conception improperly limits the discretion of municipal officials to act on behalf of the municipality and mandates a potentially dangerous all-or-nothing approach to municipal litigation. The evidence before us demonstrates the merits of the lawsuit were considered. It also demonstrates that Mentor officials acted from a variety of motives in settling the litigation, including, but not limited to, the merits of the suit, the cost of litigating the suit, the economic climate of Northeast Ohio, and the benefits to the local economy and infrastructure. None of these motives are improper or constitute bad faith, such as would support Deitrick's suit. "[A] taxpayer's suit cannot be `used to control or interfere with the discretion of a municipal board,' absent fraud or gross abuse of discretion." Ritter, 2002-Ohio-7078, at ¶ 40 (citation omitted). "[W]here a city in good faith desires to compromise and settle pending litigation, and may do so, the paramount public welfare demands that such settlement may not be hindered or thwarted by a single taxpayer, even though he be courageous in the cause of public justice." Id. at ¶ 39 (citation omitted). In the present case, there is simply no evidence that Mentor officials acted otherwise than on behalf of the public welfare or for private gain.[2] Deitrick's claims were properly dismissed. *Page 17 
 {¶ 55} Deitrick also argues the trial court erred by not considering whether Ordinance 06-O-51 constituted valid emergency legislation.
 {¶ 56} "[E]mergency ordinances or measures necessary for the immediate preservation of the public peace, health, or safety in such municipal corporation, shall go into immediate effect" provided "[s]uch emergency ordinances or measures * * * receive a two-thirds vote of all the members elected to the legislative authority, and the reasons for such necessity [are] set forth in one section of the ordinance or other measure." R.C. 731.30.
 {¶ 57} "Where an ordinance, passed by the council of a municipality, is declared to be an emergency measure in accordance with that municipality's laws and sets forth the reasons for the immediate necessity thereof, the legislative determination of the existence of an emergency is not reviewable by a court." Jurcisin v. Cuyahoga Cty. Bd.of Elections (1988), 35 Ohio St.3d 137, paragraph three of the syllabus;State ex rel. Laughlin v. James, 115 Ohio St.3d 231, 2007-Ohio-4811, at ¶ 24 ("Ohio is among those jurisdictions that hold that a declaration of an emergency ordinance is final and is not reviewable by courts") (citation omitted). However, language that is "purely conclusory, tautological, or illusory * * * fails to meet the R.C. 731.30 requirements for a valid emergency ordinance." State ex rel. Webb v. Bliss,99 Ohio St.3d 166, 2003-Ohio-3049, at ¶ 14 (citation omitted).
 {¶ 58} "The statutory requirement of stating reasons for declaring the emergency is provided only to satisfy voters that their representatives did have valid reasons for the necessity of declaring that the ordinance was an emergency. If there was in fact no emergency or if the reasons given for such necessity are not valid reasons, the voters *Page 18 
have an opportunity to take appropriate action in the subsequent election of their representatives." State ex rel. Moore v. Abrams
(1991), 62 Ohio St.3d 130, 132 (citation omitted).
 {¶ 59} Mentor Ordinance No. 06-O-51, Section 5, states: "This Ordinance is declared to be an emergency measure necessary for the preservation of the public peace, health, welfare and safety of the inhabitants of this City and for the further reason that this Ordinance is required to be immediately effective to enable the City to move forward with resolution of [the United Commercial/Jiggy] lawsuit." This language is legally sufficient to satisfy the R.C. 731.30 requirements for the enactment of an emergency ordinance. Cf. State ex rel. Waldickv. Williams, 74 Ohio St.3d 192, 195, 1995-Ohio-260 (language contained in a purportedly emergency ordinance that the measure was "for the purpose of the preservation of the public peace, safety and welfare and because the City of Delphos must comply with the EPA imposed deadlines for the improvements to its water system" satisfied the requirements of R.C. 731.30).
 {¶ 60} Deitrick asserts that the evidence in the present case demonstrates the true purpose of declaring Ordinance No. 06-O-51 an emergency was to avoid the municipal requirement that ordinances be read "on three different days" and so avoid a referendum petition challenging the settlement of the lawsuit. Regardless of the City Council's true purpose in enacting the ordinance, the determination that Ordinance No. 06-O-51 is emergency legislation is not subject to judicial review.Jurcisin, 35 Ohio St.3d 137, paragraph three of the syllabus. The Ohio Supreme Court has also expressly held that an ordinance may validly be declared an emergency even if the sole purpose in passing the ordinance "is to prevent a vote by the electorate on the *Page 19 
legislation contained in the ordinance" by referendum petition.Laughlin, 2007-Ohio-4811, at ¶ 37, citing State ex rel. Tester v. OttawaCty. Bd. of Elections (1962), 174 Ohio St. 15, 16, and Taylor v.London (2000), 88 Ohio St.3d 137, 138 fn. 3.
 {¶ 61} For the foregoing reasons, Deitrick's assignments of error are without merit. The judgment of the Lake County Court of Common Pleas, entering summary judgment in favor of the City of Mentor, is affirmed. Costs to be taxed against appellant.
TIMOTHY P. CANNON, J., concurs, COLLEEN MARY OTOOLE, J., dissents with a Dissenting Opinion.
[1] Typically, an ordinance must be "read by title on three different days" before being approved by Council. Mentor Codified Ordinances 117.06. However, "emergency measures," which require the affirmative vote of at least five members of Council, go into "immediate effect" upon enactment. Mentor Charter, Section 3.10.
[2] The "vision" of Mentor officials rushing into the developer's arms with relief that they would circumvent the "will of the voters" is not supported by the facts of this case. Such a vision does not have any foundation in the facts of this suit. It is not disputed that the lawsuit had potential merit or that the reasons given by Mentor officials for settling the lawsuit were legitimate. Having decided to avoid the uncertainties of litigation by settling, Mentor officials had no reason to waste its taxpayers' money opposing summary judgment or conducting discovery. Every Mentor official expressed the desire to avoid unnecessary litigation expenses. The appellants herein were entitled to the benefit of reasonable inferences based on the evidence, not the benefit of a cynic's conjecture.